RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0483-16T4
 A-0484-16T4

STATE OF NEW JERSEY,
 APPROVED FOR PUBLICATION
 Plaintiff-Appellant,
 September 11, 2017
v.
 APPELLATE DIVISION
CARLIA M. BRADY,

 Defendant-Respondent.
__________________________________

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

CARLIA M. BRADY,

 Defendant-Appellant.
___________________________________

 Argued May 23, 2017 – Decided September 11, 2017

 Before Judges Messano, Espinosa and Suter.

 On appeal from the Superior Court of New
 Jersey, Law Division, Somerset County,
 Indictment No. 15-05-0240.

 W. Brian Stack, Assistant Prosecutor, argued
 the cause for appellant in A-0483-16 and
 respondent in A-0484-16 (Michael H.
 Robertson, Somerset County Prosecutor,
 attorney; Mr. Stack, on the briefs).

 Timothy R. Smith argued the cause for
 respondent in A-0483-16 and appellant in A-
 0484-16 (Caruso, Smith, Picini, PC,
 attorneys; Mr. Smith, of counsel and on the
 brief; Steven J. Kaflowitz, on the brief).

 The opinion of the court was delivered by

MESSANO, P.J.A.D.

 These appeals require us to consider the inherent duties of

a judge of the Superior Court of New Jersey, whether those

duties include an obligation to take whatever steps necessary at

any time to "enforce an arrest warrant," and if such a duty

exists, what must a judge do to perform, and not refrain from

performing, that duty. A Somerset County grand jury indicted

Carlia M. Brady, a judge assigned to the Middlesex Vicinage,

charging her with second-degree official misconduct, N.J.S.A.

2C:30-2b (count one); and two counts of third-degree hindering

the apprehension or prosecution of Jason Prontnicki, N.J.S.A.

2C:29-3a(1) and a(2) (counts two and three). The Law Division

judge granted defendant's motion to dismiss count one of the

indictment but denied the motion as to counts two and three.

The judge subsequently denied motions for reconsideration filed

by defendant and the State of New Jersey.

 We granted the State's motion for leave to appeal (A-0483-

16), as well as defendant's motion for leave to appeal (A-0484-

16), and consolidated both appeals to issue a single opinion.

We now affirm.

 2 A-0483-16T4
 I.

 We summarize the evidence produced by the State before the

grand jury, then consider the legal instructions the prosecutor

gave to the panel and the judge's reasoning in deciding

defendant's motion.

 A.

 The Woodbridge Police Department initially commenced the

investigation, which was transferred subsequently to the

Somerset County Prosecutor's Office.1 Prontnicki and defendant

started dating in late 2012 and began living together in

defendant's home in Woodbridge by March 2013. Defendant took

the oath of office as a Superior Court judge on April 5, 2013.

On April 29, 2013, the Old Bridge municipal court issued a

warrant for Prontincki's arrest, charging him with robbery of a

pharmacy, possession of a weapon — a crowbar — for an unlawful

purpose and unlawful possession of a weapon.

 Shortly after 10:00 a.m. on the morning of June 10, 2013,

while on vacation, defendant went to the Woodbridge Police

Department to report one of her cars was missing. Woodbridge

Police Officer Walter Bukowski, along with Officer Robert

Bartko, interviewed defendant.

1
 Because defendant was a sitting judge in Middlesex County,
where the crimes allegedly occurred, venue for the prosecution
was transferred to Somerset County.

 3 A-0483-16T4
 She advised police that Prontnicki originally told her he

had loaned the car to his brother in Bayonne. However, when the

brother failed to return the car by 2:00 a.m., she and

Prontnicki drove to Bayonne to recover the car. On the way,

Prontnicki changed his story and told defendant that he lent the

car to a friend. Together, defendant and Prontnicki drove

around Hudson County for two hours, were unable to locate the

car and returned to Woodbridge. Prontnicki returned to Hudson

County at 6:00 a.m. to continue the search, and defendant told

him she would report the car stolen if she did not hear from him

by 10:00 a.m.

 Utilizing various databases, police located the outstanding

warrant for Prontnicki's arrest for the Old Bridge robbery, as

well as another outstanding arrest warrant. They also

determined Prontnicki's driver's license was suspended.

Bukowski testified that he and Bartko told defendant

 [Y]ou're an officer of the court, you have
 an obligation or it would be in your best
 interest to let us know if [Prontnicki] is
 somewhere . . . now or if once we left, if
 she came back that . . . it would be her
 duty to call us and let us know if
 [Prontnicki] came home.

Police tried unsuccessfully to locate Prontnicki's friend who

allegedly had the car. Defendant wanted to sign a complaint

against the friend, but police told her she could only sign a

 4 A-0483-16T4
complaint against Prontnicki, who actually took the car.

Defendant declined until she spoke to her family and attorney,

and then left the police station. Police periodically rode by

defendant's home afterwards and saw the missing car parked in

her driveway at 9:35 p.m. They knocked on her door, but no one

answered.

 Investigators secured defendant's cellphone records as part

of the investigation. Between 12:36 p.m. and 12:43 p.m. on June

10, defendant sent text messages to friends, in which she

acknowledged police told her of the robbery, which occurred

after Prontnicki moved in with her and after defendant became a

judge. In one text, defendant wrote, "I can't have [Prontnicki]

in my house [because] I [would] now be harboring a criminal. I

[would] have to report him."

 Shortly thereafter, Prontnicki called defendant's

cellphone. Defendant recounted the conversation in a text

message she sent to a friend at 1:37 p.m. on June 10:

 [Prontnicki] just called to tell me he got
 the car and will bring it home. I told him
 he can't stay with me [because] he has a
 warrant out for his arrest and I am required
 to notify authorities when I know someone
 has a warrant. So I told him he must leave
 after he drops the car off as I must go to
 the police.

 Prontnicki corroborated these events in a statement to

police after his arrest. He arrived at defendant's home with

 5 A-0483-16T4
the car, and defendant's father let him into the house. He and

defendant went into the garage and spoke for approximately one

hour. She told him she was "supposed to call the Woodbridge

Police when he arrived," and Prontnicki told her to "do what you

have to do." Prontnicki refused defendant's offer of money for

cab fare and left for his brother's house in Woodbridge.

 Defendant called Woodbridge police at 4:36 p.m. and asked

to speak to Officer Bartko; he was unavailable, but defendant

left the following voice mail:

 [T]his is Carlia Brady. . . . I sat with
 you to fill out [an] incident report . . .
 with regard to the unlawful taking of my car
 . . . . I just wanted to report . . . that
 . . . Prontnicki, the suspect . . . actually
 returned it just now. . . . [I]t is in my
 driveway. I haven't inspected it yet cause
 it's raining and I didn't bring it into my
 house because I didn't want it in my house
 unless I can inspect it. . . . I just
 wanted to let that be known. Also, to let
 you know since there's a warrant out for his
 arrest, he is not with me, but he is in
 Woodbridge cause he left . . . my property
 so please give me a call back. I, we need
 to know whether an amended report needs to
 be redone . . . or added, whatever I needed
 to do. Please give me a call back . . . .

 Defendant was also on vacation the next day, June 11. That

morning, she and Prontnicki had a two-hour and twenty-three

minute phone conversation. Prontnicki told police he asked

defendant when she would be home because he needed to pick up

some clothing; defendant told him she would be at the house

 6 A-0483-16T4
between 3:00 p.m. and 4:00 p.m. Police, meanwhile, decided to

surveil defendant's home.

 At 1:49 p.m., Prontnicki called defendant to confirm she

would be in her house as planned. At 2:14 p.m., defendant sent

a text message to a friend, in which she repeated Prontnicki's

denials of involvement in the robbery. She also wrote:

 He . . . will turn himself in . . . when his
 lawyer is able to come with him and
 cooperate fully with the cops by giving them
 everything he knows. He can't stay in my
 house cos (sic) he has an arrest warrant
 right now and I have a duty as a judge to
 report all crimes and anyone with an arrest
 warrant. So he is at his brother's house.

At 3:31 p.m., defendant again called police and left a

voicemail, advising that Prontnicki had returned her car and she

wanted to know when she could obtain an amended report. She did

not tell police about her conversations with Prontnicki, or that

she expected him at her home shortly.

 At 3:48 p.m., Prontnicki called defendant as he drove to

defendant's home with his brother. Undercover police stationed

outside defendant's home observed Prontnicki exit the passenger

side of his brother's car. The garage door opened and defendant

was standing on the threshold. Prontnicki entered the garage,

the door shut, and he stayed for approximately one hour. Police

then saw the garage door open, and defendant and Prontnicki

appeared. Holding a duffel bag, Prontnicki returned to his

 7 A-0483-16T4
brother's car, entered and drove away. Police stopped the car

some distance from defendant's home and arrested Prontnicki. In

the bag were multiple items of clothing and miscellaneous

papers. In his statement to police, Prontnicki said defendant

prepared a bag of his clothing before he arrived, and he

transferred the clothing to a duffel bag.

 In text messages to friends sent immediately after

Prontnicki left, defendant described his claims that there was

no outstanding warrant for robbery, he was only wanted for

questioning, police arrested someone else for the crime and his

driver's license was not suspended. Minutes later, police

arrived and arrested defendant at her home.

 The grand jurors heard a recording of defendant's

conversation with Bartko in the police vehicle as he took her to

headquarters. Among other things, defendant told the officer

she was not trying to break the law and was only helping her

boyfriend, who denied there was an outstanding warrant for his

arrest.

 Defendant testified at length before the grand jury and

confirmed many of these events. However, defendant claimed that

during her visit to the police station on the morning of June

10, police told her to call them only when she knew Prontnicki's

exact whereabouts. She told them he might be at her home as

 8 A-0483-16T4
they spoke, because he had keys to the house, and offered police

her keys. She suggested they surveil her home, but they refused

her offers. Defendant was concerned for her safety and told

police she did not want "to be in the middle." She would only

call them when it was safe, i.e., when Prontnicki was not

present, which was why she waited until Prontnicki left before

calling police after he returned her car.

 Defendant asked police to see a copy of the arrest warrant,

but they refused. She offered them photographs of the Hudson

County street where she and Prontnicki searched for her car, but

the officers were not interested. Defendant did not want to

return to her home once she knew about the robbery warrant, but

police would not let her stay at the police station.

 Defendant described in detail Prontnicki's return of the

car and the one-hour long conversation she had with him in the

garage. Her father offered Prontnicki cab fare.

 Defendant insisted that the recordings of both her calls to

the Woodbridge Police Department lacked critical information she

had provided to the police. The prosecutor instructed the grand

jurors that both the State and defense had experts evaluate the

accuracy and authenticity of the recordings, and there was a

dispute between those experts. Defendant said that during the

first call on June 10, she told police Prontnicki was in

 9 A-0483-16T4
Woodbridge, staying at his brother's house, and described its

location. Defendant specifically remembered telling police she

was "attempting to discharge any reporting obligations per

[their] instructions."

 She again challenged the accuracy of the recorded

conversation of her second phone call to police headquarters.

Defendant claimed the recording omitted her statement that she

wanted to confirm that police had received the update of

Prontnicki's whereabouts she had provided the day before.

 Defendant testified that on June 11, Prontnicki told her

his brother would come over to pick up his things. Instead,

Prontnicki opened the garage door with a remote control that he

had. He gathered some things, but defendant kept her distance

and urged him to turn himself in to police. Defendant said

Prontnicki left through the garage door, and, after she closed

the door, she intended to go to the police station. Police

arrived and arrested her, however, before she could leave.

 Other witnesses who testified after defendant directly

contradicted portions of her testimony, specifically, the

interactions with police at headquarters on June 10, and the

events at defendant's home on June 11 when Prontnicki arrived

and retrieved his clothing.

 10 A-0483-16T4
 B.

 Before any testimony, the prosecutor advised the grand

jurors that defendant was charged in two complaints with

hindering by harboring Prontnicki, knowing he was a fugitive

charged with robbery, N.J.S.A. 2C:29-3a(1), and by "deceiving

law enforcement by not immediately notifying law enforcement of

. . . Prontnicki's . . . whereabouts." N.J.S.A. 2C:29-3a(5).

The prosecutor further advised that he would make a "direct

presentation" on the charge of official misconduct, in that

defendant "failed to perform a duty . . . inherent in the office

of [S]uperior [C]ourt judge, that is to enforce an arrest

warrant for . . . Prontnicki by failing to adequately notify the

. . . Police Department of . . . Prontnicki['s] intended

appearance or presence at [defendant's] house." He explained,

the State contended defendant refrained from performing this

duty for her own benefit — to avoid the embarrassment of having

her boyfriend arrested — and for Prontnicki's benefit —

"avoiding jail."

 The prosecutor provided written instructions to the grand

jury, including the elements of N.J.S.A. 2C:29-3a(1) and (2),2

and criminal attempt, N.J.S.A. 2C:5-1. As to official

2
 The prosecutor never charged the grand jury with respect to
N.J.S.A. 2C:29-3a(5).

 11 A-0483-16T4
misconduct, N.J.S.A. 2C:30-2b, the prosecutor began by generally

following Model Jury Charge (Criminal), "Official Misconduct

(N.J.S.A. 2C:30-2)" (Sept. 11, 2006). He then described "one of

the central issues in this case."

 Is there a duty clearly inherent in the
 office of [S]uperior [C]ourt judge? The
 first question is does a . . . judge have an
 inherent duty to enforce an arrest warrant?
 The second question would be what does that
 duty entail? And, third, did . . .
 defendant refrain from performing that duty
 in this case? These are all . . . issues
 for you to decide.

 [(Emphasis added).]

The prosecutor told the grand jury "there is no statute,

decision or rule of law which expressly states a judge must

enforce an arrest warrant." However, he continued, "a [c]ourt

may take judicial notice of [a judge's obligation]" if it is

"inherent in the office of judge of the [S]uperior [C]ourt."

 The prosecutor discussed "arrest warrants." He said a

police officer "has a non-discretionary expressed obligation to

arrest where he or she is aware of the existence of an arrest

warrant." However, referencing the Court's decision in In Re

P.L. 2001, Chapter 362, 186 N.J. 368 (2006), the prosecutor

said, "it is not the job of a judge to execute an arrest

warrant." The prosecutor cited provisions of the Code of

Judicial Conduct (the Code), but cautioned, "these are general,

 12 A-0483-16T4
general obligations. For you to find official misconduct

here[,] you must find a duty to enforce, . . . clearly inherent

in the office of [S]uperior [C]ourt judge, not just a general

duty to obey the law." The prosecutor stated, "a judge may, and

I emphasize may, have a duty to see that a warrant is executed

if such a duty is clearly inherent in the office of [S]uperior

[C]ourt judge." (Emphasis added). He repeated it was for the

grand jurors to decide if a judge had "an inherent duty to

enforce an arrest warrant[.]"

 After all testimony ended, the prosecutor again provided

instructions on the hindering complaints. As to official

misconduct, he told the grand jurors there were three elements:

whether defendant was a public servant; whether "she refrained

from performing a duty imposed upon her by law, or clearly

inherent in the nature of her office"; and, whether "her purpose

in refraining from acting was to benefit herself or another or

injure another."

 He continued,

 [W]ith regard to that duty, that duty must
 be official and nondiscretionary. It's
 imposed upon a public servant by law such as
 a statute, municipal charter or ordinance or
 clearly inherent in the nature of her
 office. The duty to act must be so clear
 that the public servant is on notice as to
 the standards she must meet. In other
 words, the failure to act must be more than
 a failure to exhibit good judgment.

 13 A-0483-16T4
 The State has to prove that there's a
 clear duty of defendant to act as alleged,
 that is to say, there must have been a body
 of knowledge such as applicable law by which
 defendant could regulate the legality of her
 conduct. She can't be convicted of . . .
 official misconduct[] if the official duties
 imposed upon her are themselves unclear.

 So that brings us to the question of,
 is there a duty clearly inherent in the
 nature of a [S]uperior [C]ourt judge, does
 she have an inherent duty to enforce an
 arrest warrant, what does that duty entail
 and, if so, did she refrain from performing
 that duty in this case for the purpose of a
 benefit herself or detriment of another.

 Again, . . . you have to remember, if
 you find a duty to enforce, it must be
 clear. In this case, it must be clearly
 inherent in the office of a [S]uperior
 [C]ourt judge.

During deliberations, the grand jurors asked several times for

clarification regarding the law as to hindering apprehension but

asked for no further instructions on the recommended official

misconduct count.

 The indictment charged defendant with official misconduct

in that, with the purpose to benefit herself "and/or another,"

she "refrain[ed] from performing a duty clearly inherent in the

nature of her office . . . , that is, . . . [she] knowingly . .

. fail[ed] to enforce an arrest warrant . . . by failing to

adequately notify the Woodbridge Police Department of . . .

[Prontnicki's] intended appearance or presence at her

 14 A-0483-16T4
residence." N.J.S.A. 2C:30-2b. Count two charged defendant

with purposely "hinder[ing] the detention, apprehension,

investigation, prosecution, conviction or punishment of . . .

Prontnicki," by "harbor[ing] or conceal[ing]" him. N.J.S.A.

2C:29-3a(1). The third count charged defendant with hindering

by "offer[ing] to provide to or aid . . . Prontnicki in

obtaining money, transportation and/or clothing as a means of

avoiding discovery or apprehension or effecting escape."

N.J.S.A. 2C:29-3a(2).

 C.

 In her written decision, the motion judge rejected the

State's argument that a judge has "a duty inherent in her office

to enforce an arrest warrant, or that there is a specifically

required time limit in which [d]efendant was required to act."

The judge also concluded that defendant was not "acting in her

official capacity. There is no connection between the duties

inherent in the office of Judge and the . . . conduct here."

 The judge denied defendant's motion as to counts two and

three. Giving the State the benefit of all reasonable

inferences, she reasoned there was some evidence that defendant

admitted Prontnicki into her home knowing there was an

outstanding warrant for his arrest, permitted him to stay there

"for a significant period of time, and did not inform the

 15 A-0483-16T4
police." As to the second hindering count, the judge concluded

there was some evidence that defendant aided Prontnicki by

allowing him into her home to "get his clothes and be offered

cab fare."

 The judge found no reason to reconsider her earlier

decision in denying the State's and defendant's motions for

reconsideration.

 II.

 We review the trial court's decision on defendant's motion

to dismiss the indictment for an abuse of discretion. State v.

Saavedra, 222 N.J. 39, 55 (2015). "A trial court's exercise of

this discretionary power will not be disturbed on appeal 'unless

it has been clearly abused.'" Id. at 55-56 (quoting State v.

Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994), certif.

denied, 140 N.J. 277 (1995)).

 "A trial court deciding a motion to dismiss an indictment

determines 'whether, viewing the evidence and the rational

inferences drawn from that evidence in the light most favorable

to the State, a grand jury could reasonably believe that a crime

occurred and that the defendant committed it.'" Id. at 56-57

(quoting State v. Morrison, 188 N.J. 2, 13 (2006)). "A trial

court . . . should not disturb an indictment if there is some

evidence establishing each element of the crime to make out a

 16 A-0483-16T4
prima facie case." Morrison, supra, 188 N.J. at 12 (citations

omitted). However, "[t]he absence of any evidence to support

the charges would render the indictment 'palpably defective' and

subject to dismissal." Ibid. (citing State v. Hogan, 144 N.J.

216, 228-29 (1996)). "[O]ur review of a trial judge's legal

interpretations is de novo." State v. Eldakroury, 439 N.J.

Super. 304, 309 (App. Div.) (citing State v. Grate, 220 N.J.

317, 329-30 (2015); State v. Drury, 190 N.J. 197, 209 (2007)),

certif. denied, 222 N.J. 16 (2015).

 A.

 In A-0484-16, defendant argues that, even if she allowed

Prontnicki into her home with knowledge of the outstanding

warrant, such "passive" conduct does not support an indictment

for harboring or concealing a fugitive under N.J.S.A. 2C:29-

3a(1). She also argues that the State failed to demonstrate she

acted with the purpose of hindering Prontnicki's apprehension

because the overwhelming evidence was to the contrary.

Regarding count three, defendant essentially argues that even if

she offered Prontnicki aid, whether in the form of money,

transportation or clothing, it was insufficient to prove a

violation of N.J.S.A. 2C:29-3a(2). We reject these arguments

and affirm the judge's order denying defendant's motion to

dismiss counts two and three of the indictment.

 17 A-0483-16T4
 The statute provides:

 a. A person commits an offense if, with
 purpose to hinder the detention,
 apprehension, investigation, prosecution,
 conviction or punishment of another for an
 offense . . . he:

 (1) Harbors or conceals the other;

 (2) Provides or aids in providing a weapon,
 money, transportation, disguise or other
 means of avoiding discovery or apprehension
 or effecting escape . . . .

 [N.J.S.A. 2C:29-3a(1) and (2).]

As to subsection (1), the State must produce some evidence that

defendant knew Prontnicki could or might be charged with an

offense; that she harbored or concealed him; and her purpose in

doing so was to hinder Prontnicki's detention, apprehension,

investigation, prosecution, conviction or punishment. Model

Jury Charge (Criminal), "Hindering Apprehension or Prosecution

of Another (N.J.S.A. 2C:29-3a)" (May 12, 2014) (Hindering

Charge). Defendant "harbored or concealed" Prontnicki if she

"hid, or protected, or sheltered or secreted [him] from the

authorities." Id. at 2.

 Because of the lack of decisions construing subsection

a(1), both sides rely on precedent interpreting an analogous

provision of the United States Code, 18 U.S.C.A. § 1071, which

provides:

 18 A-0483-16T4
 Whoever harbors or conceals any person for
 whose arrest a warrant or process has been
 issued under the provisions of any law of
 the United States, so as to prevent his
 discovery and arrest, after notice or
 knowledge of the fact that a warrant or
 process has been issued for the apprehension
 of such person, shall be fined under this
 title or imprisoned not more than one year,
 or both . . . .

In construing a predecessor provision, the court in United

States v. Shapiro, said, "To conceal . . . means to hide,

secrete, or keep out of sight. To harbor . . . means to lodge,

to care for, after secreting the [fugitive]." 113 F.2d 891, 893

(2d Cir. 1940) (quoting Firpo v. United States, 261 F. 850, 853

(2d Cir. 1919)).

 Defendant argues the analogous federal statute requires

"[s]ome affirmative, physical action" to "harbor or conceal,"

United States v. Lockhart, 956 F.2d 1418, 1423 (7th Cir. 1992),

and allowing Prontnicki to enter her home was insufficient.

However, the Fifth Circuit held that the defendant's physical

act of closing and locking the door where a fugitive was hiding

after she saw federal marshals was sufficient to convict her of

violating the statute. United States v. Stacey, 896 F.2d 75, 77

(5th Cir. 1990).

 Defendant ignores the basic proposition that "[i]n the

grand jury setting, our law sharply distinguishes between

evidence sufficient to support an indictment and the evidence

 19 A-0483-16T4
necessary to establish guilt beyond a reasonable doubt." State

ex rel. A.D., 212 N.J. 200, 219 (2012). "At the indictment

stage, the State need not present evidence necessary to sustain

a conviction, but only a showing sufficient for the grand jury

to 'determine that there is prima facie evidence to establish

that a crime has been committed.'" Id. at 220 (quoting Stave v.

N.J. Trade Waste Ass'n, 96 N.J. 8, 27 (1984)).

 According the State all favorable and reasonable

inferences, the evidence established that defendant knew

Prontnicki was wanted for armed robbery and permitted him to

enter her home on two occasions for significant periods of time.

On June 11, she specifically told him when she would be home,

knowing he intended to gather some of his belongings and leave.

Nonetheless, she never told police he would be arriving. The

grand jurors were entitled to reject defendant's version of the

events on June 11, and accept that defendant affirmatively

opened the garage door, closed it after Prontnicki entered the

home, provided him with some of his belongings, including more

clothing than was necessary for a short stay at his brother's

house, and escorted him out through the garage until he left.

 Defendant argues she did not know police were looking for

Prontnicki. This ignores the reasonable inference to be drawn

from defendant's own call to police the day earlier, in which

 20 A-0483-16T4
she told police Prontnicki had returned the car and, although

not with her at that moment, was somewhere in Woodbridge.

Defendant also contends that, since much of the interaction

occurred in the garage, she did not secrete Prontnicki from

public observation. That argument lacks any merit, since it is

undisputed that on both June 10 and 11, Prontnicki spent more

than one hour inside the house, where he was shielded from

observation, or in the garage with the door shut.

 The grand jurors were also free to reject defendant's

explanation of why she acted as she did, and conclude, based on

reasonable inferences, that her purpose was to hinder

Prontnicki's apprehension. See, e.g., Hindering Charge, supra,

at 4 (explaining purpose is a "condition[] of the mind which

cannot be seen and can only be determined by inferences from

conduct, words or acts"). We affirm the denial of the motion

to dismiss count two of the indictment.

 As to count three charging defendant with harboring under

subsection a(2), the critical issue is whether there was

sufficient prima facie evidence that, with a similar purpose,

defendant "provided (or aided in providing) . . . money,

transportation, [and/or clothing as a] means of avoiding

 21 A-0483-16T4
discovery or apprehension or affecting escape) to" Prontnicki.3

Id. at 2.

 Defendant appropriately points to a footnote to the

Hindering Charge which provides:

 Providing a fugitive with funds is an act of
 equivocal significance. He may use it to
 escape or hide, to pay debts or go into
 business, or to support himself or his
 dependents, or to hire a lawyer. Paragraph b
 [now 3a(2)] is intended to require proof
 that money was furnished not merely pursuant
 to a general desire to promote the
 offender's plan to remain at large, but
 specifically to facilitate escape efforts.

 [Ibid. n.3 (quoting Final Report of the New
 Jersey Criminal Law Revision Commission,
 Vol. II at 284-85 (1971)).]

The Model Penal Code (MPC) § 242.3 was a source for N.J.S.A.

2C:29-3. Cannel, New Jersey Criminal Code Annotated, comment 1

on N.J.S.A. 2C:29-3 (2017). Specifically, the commentary to the

MPC includes nearly verbatim language to that which we just

quoted. See MPC, supra, comment on 4 § 242.3 (Am. Law Inst.

1980). However, the MPC omitted providing money to a fugitive

as one means by which the actor may hinder apprehension. MPC,

supra, § 242.3. Our Legislature rejected that course and

included money in N.J.S.A. 2C:20-3a(2). The Revision Commission

recognized that in providing money to a fugitive, the actor's

3
 We modify the language of the Model Charge to include only the
specific items contained in count three of the indictment.

 22 A-0483-16T4
"motivation[] may be mixed and permit conviction where the

obstructive purpose was present." Final Report, supra, at 284.

 Here, the evidence taken in the best light for the State

indicates defendant offered Prontnicki money for cab fare, which

he refused. The State concedes that at most, this was an

attempt to hinder Prontnicki's apprehension, and it charged the

grand jury with the law regarding attempt. We conclude that

under all circumstances presented, the State adduced some

evidence that defendant's offer was an attempt to facilitate

Prontnicki's escape. The grand jury was free to reject

Prontnicki's claim that he intended only to return to his

brother's home, hire a lawyer and turn himself in, i.e., to

remain "at large," as opposed to avoid prosecution. There was

no independent proof that was his intention, and a reasonable

inference can be drawn otherwise, particularly since the bag of

clothing provided Prontnicki with numerous changes of clothing.

 The grand jurors could reasonably conclude the packed bag

provided Prontnicki with a "means of avoiding discovery or

apprehension or effecting escape." N.J.S.A. 2C:29-3a(2).

Moreover, as already noted, defendant's purpose may be

determined from all the circumstances presented, including

taking these actions without calling police, despite knowing

beforehand that Prontnicki was coming to her home. We affirm

 23 A-0483-16T4
the denial of defendant's motion to dismiss count three of the

indictment.

 B.

 The State's appeal presents issues of significant

importance beyond this case. We tread cautiously, with an

express desire that our decision be limited only to the facts

presented by this appeal and the arguments made by the State.

 N.J.S.A. 2C:30-2 is based upon New York Penal Law § 195.00.

Cannel, supra, comment 1 on N.J.S.A. 2C:30-2. "Misconduct in

office or official misconduct has been defined as 'unlawful

behavior in relation to official duties by an officer entrusted

with the administration of justice or who is in breach of a duty

of public concern in a public office.'" State v. Kueny, 411

N.J. Super. 392, 404 (App. Div. 2010) (quoting State v. Mason,

355 N.J. Super. 296, 301 (App. Div. 2002)).

 N.J.S.A. 2C:30-2b provides:

 A public servant is guilty of official
 misconduct when, with purpose to obtain a
 benefit for himself or another or to injure
 or to deprive another of a benefit[,] . . .
 [h]e knowingly refrains from performing a
 duty which is imposed upon him by law or is
 clearly inherent in the nature of his
 office.4

4
 Few states have adopted the "clearly inherent" language found
in subsection (b) of our statute. See Alaska Stat. § 11.56.850
(2017); Ark. Code Ann. § 5-52-107 (1987); Del. Code Ann. tit.
11, § 1211 (2017); Ky. Rev. Stat. Ann § 522.030 (2017); Or.
 (continued)

 24 A-0483-16T4
As we said in Kueny,

 The three elements required to establish a
 violation of N.J.S.A. 2C:30-2(b) are that
 "(1) the defendant was a public servant; (2)
 the defendant knowingly refrained from
 performing a duty which is imposed upon him
 or her by law or which is clearly inherent
 in the nature of the office; and (3) the
 defendant's purpose in so refraining was to
 benefit himself or herself or to injure or
 deprive another of a benefit."

 [411 N.J. Super. at 404 (quoting State v.
 Thompson, 402 N.J. Super. 177, 195-96 (App.
 Div. 2008)).]

There is no dispute as to the first and third elements.

Defendant is a public servant. See N.J.S.A. 2C:27-1g (defining

"[p]ublic servant" to include "judges"). A "'[b]enefit' means

gain or advantage, or anything regarded by the beneficiary as

gain or advantage, including a pecuniary benefit or a benefit to

any other person or entity in whose welfare he is interested."

N.J.S.A. 2C:27-1a. Although defendant disputes whether her

(continued)
Rev. Stat. Ann. § 162.415 (2017); Tenn. Code Ann. 39-16-402
(2017); Utah Code Ann. § 76-8-201 (2017). Others limit the
crime only to the actor's failure to perform a duty required by
law. See Colo. Rev. Stat. § 18-8-405 (1973); 720 Ill. Comp.
Stat. 5/33-3 (2017); Iowa Code § 721.2 (2017); Mont. Code Ann.
45-7-401 (2017); Wis. Stat. 946.12 (2017); Wyo. Stat. Ann. 6-5-
107 (2017). In People v. Beruman, 638 P.2d 789, 793 (Colo.
1982), the court held the predecessor statute, which included
the language "a duty . . . clearly inherent in the nature of his
office," was unconstitutionally vague.

 25 A-0483-16T4
conduct benefitted herself or Prontnicki, the argument lacks

sufficient merit to warrant discussion. R. 2:11-3(e)(2); see,

e.g., State v. Quezada, 402 N.J. Super. 277, 285 (App. Div.

2008) (concluding "joy of responding to fires as a volunteer

firefighter" was sufficient). Only the second element is at

issue in this case.

 We must consider the duties of a Superior Court judge, not

as "imposed by law," i.e., expressed in a statute, the Code or

administrative policy or directive applicable to judges of the

Superior Court. See Schochet v. Schochet, 435 N.J. Super. 542,

545 n.3 (App. Div. 2014) (noting policies adopted by the

Administrative Office of the Courts have the force of law). The

State concedes none of those sources impose a duty upon a judge

to "enforce an arrest warrant." It argues instead that

decisional law, the Code, policies directed to other judiciary

employees and common sense provide guidance regarding duties

"clearly inherent in the nature of [a judge's] office,'"

N.J.S.A. 2C:30-2b, one of which is to enforce an arrest warrant.

We therefore consider whether such a duty is inherent in the

office based upon these other sources.

 "[N.J.S.A. 2C:30-2b] criminalizes the knowing failure to

perform a duty. The duty must be 'one that is unmistakably

inherent in the nature of the public servant's office, i.e., the

 26 A-0483-16T4
duty to act is so clear that the public servant is on notice as

to the standards that he must meet.'" Thompson, supra, 402 N.J.

Super. at 198 (quoting State v. Hinds, 143 N.J. 540, 545-46

(1996)). "[T]he failure to act must be more than a mere breach

of good judgment. In the absence of a duty to act, there can be

no conviction." Kueny, supra, 411 N.J. Super. at 406 (quoting

Final Report, supra, at 291).

 "Whether a statutory duty is imposed upon a public officer

is a legal issue." State v. Deegan, 126 N.J. Super. 475, 482

(App. Div.), certif. denied, 65 N.J. 283 (1974). Yet, because

it is practically impossible to spell out every duty imposed

upon a public official, "[i]t is within the province of the

court to 'take judicial notice of the duties which are inherent

in the very nature of the office.'" Thompson, supra, 402 N.J.

Super. at 198 (quoting Deegan, supra, 126 N.J. Super. at 492).

Regardless from where the duty emanates, it is a question of law

whether one actually exists. State v. Grimes, 235 N.J. Super.

75, 79 (App. Div.), certif. denied, 118 N.J. 222 (1989).

 1.

 In opposing the State's motion for reconsideration,

defendant argued alternatively that the first count of the

indictment should be dismissed because the prosecutor let the

grand jury decide whether a Superior Court judge has an inherent

 27 A-0483-16T4
duty to "enforce an arrest warrant." The motion judge agreed

that whether such a duty existed was a "question of law," and

stated the grand jury "cannot make such a finding." Although,

she did not specifically adopt defendant's argument, we do, and

therefore affirm dismissal of the indictment on these grounds

alone.

 "A prosecutor must charge the grand jury 'as to the

elements of specific offenses.'" Eldakroury, supra, 439 N.J.

Super. at 309 (quoting State v. Triestman, 416 N.J. Super. 195,

205 (App. Div. 2010)). "[A]n indictment will fail where a

prosecutor's instructions to the grand jury were misleading or

an incorrect statement of law." Ibid. (quoting Triestman,

supra, 416 N.J. Super. at 205). In Eldakroury, we affirmed the

trial court's dismissal of an indictment, concluding "the

State's instruction to the jury was 'blatantly wrong' and, in

effect, relieved the State from having to establish defendant's

mens rea as to a material element of the offense." Id. at 310.

 Here, it was incumbent on the prosecutor to specifically

define the duty that defendant "refrain[ed] from performing" and

which was "clearly inherent" in the office of a Superior Court

judge. N.J.S.A. 2C:30-2b. Yet, on multiple occasions in his

instructions, the prosecutor invited the grand jury to decide

whether or not the obligation to "enforce an arrest warrant" was

 28 A-0483-16T4
clearly inherent in the duties of a Superior Court judge. In

Grimes, we reversed the defendant's conviction and dismissed the

indictment, because, in part, the "law" as to the duties of the

defendant's office as constable were "so uncertain that it was

presented to the jury as a matter of disputed fact." 235 N.J.

Super. at 90.

 The grand jury is, of course, "an accusatory and not an

adjudicative body." Hogan, supra, 144 N.J. at 235. We might

assume the return of defendant's indictment implicitly reflects

the grand jurors' conclusions that a duty existed and defendant

refrained from performing it. Nevertheless, in the first

instance, the prosecutor must clearly and accurately explain the

law to the grand jurors and not leave purely legal issues open

to speculation by lay people who are simply performing their

civic duty.

 Our conclusion is not a criticism of the prosecutor's

presentation. He attempted in good faith and in substantial

detail to synthesize the law. However, the prosecutor demurred

in telling the grand jury a duty existed. That hesitation

reflects the exquisitely difficult task of trying to define the

duty in the first instance, and what actions a judge must take

to perform that duty, the avoidance of which could result in

criminal culpability.

 29 A-0483-16T4
 The prosecutor's quandary demonstrates why we are required

to do more in this opinion. Avoiding the question of whether it

is the duty of a Superior Court judge to "enforce an arrest

warrant," or face conviction for a second-degree crime if he or

she refrains from performing that "duty," does a disservice to

this defendant, other judges and the public-at-large. We will

not avoid deciding the merits of the State's case, because the

issue will only arise again should the State simply present the

same evidence with more definitive instructions to a new grand

jury.

 2.

 The State argues that a judge has a non-discretionary duty,

inherent in her office, to enforce an arrest warrant, and,

because a judge is always "on duty," defendant was criminally

culpable for not notifying police when Prontnicki was either at,

or on his way to, her home. It further argues defendant's own

statements make clear she was aware of this duty.5

5
 The State also pre-emptively argues that imposing such a duty
on a judge does not violate the constitutional separation of
powers, discussed in In Re P.L. 2001. There, the Court held the
Probation Officer Community Safety Unit Act, N.J.S.A. 2B:10A-1
to -3; N.J.S.A. 2C:39-6(c)(17), which created a unit of
probation officers authorized to carry firearms and arrest
probation violators, breached the constitutional separation of
powers. In re P.L. 2001, supra, 186 N.J. at 372-73, 394. The
 (continued)

 30 A-0483-16T4
 This second point lacks sufficient merit to warrant

discussion. R. 2:11-3(e)(2). While defendant told friends it

was her duty as a judge to notify police about Prontnicki's

whereabouts, those statements followed her interaction with

members of the Woodbridge Police Department, who told her that

was her judicial "duty." Obviously, defendant's subjective

belief that a duty exists, if none exists at law, cannot support

an essential element of the crime of official misconduct.

 The State cites various decisions to support the

proposition that defendant refrained from performing an official

duty inherent in her office; however, none of them are

persuasive under the facts of this case. For example, Deegan,

supra, 126 N.J. Super. at 480, predates enactment of our

(continued)
Court stated, "[I]t is the duty of the many municipal, county,
and state law enforcement agencies to execute arrest warrants,
including those of probation violators. Those are executive,
not judicial, branch functions." Id. at 391 (emphasis added).
While "the principle of separation of powers is not inconsistent
with the notion of cooperation among the several branches toward
the common goal of achieving responsible government[,]" id. at
383, "the special role of the judiciary in our constitutional
scheme requires that there be no entangling alliances between
law enforcement and judiciary employees." Id. at 388.

 The State argues that as a judge, defendant had an inherent
duty to enforce an arrest warrant, not execute the warrant by
actually arresting Prontnicki. Because we are affirming for
other reasons, we need not decide whether this is a meaningful
distinction that renders In re P.L. 2001 unpersuasive authority
for defendant's position.

 31 A-0483-16T4
Criminal Code, and so does not address the very precise language

of N.J.S.A. 2C:30-2b.6 Our opinion in Deegan supports the

proposition that the duties of a public office need not be

expressed in any statute, and "[t]he power to act imports a duty

to act when the public interests suggest to the public officials

that something should be done." Id. at 490 (citing McDonough v.

Roach, 35 N.J. 153, 157 (1961)). However, in Deegan, the

defendants' duties, although not expressed in a statute, were

the very duties of the position, i.e., approving the award of

disability pensions to only qualified candidates. Id. at 480.

Defendants' actions or omissions involved the only essential

tasks they were empowered to perform.

 The same principle is at the core of State v. Weleck, 10

N.J. 355 (1952), another pre-Code case. There, the defendant, a

borough attorney, was charged with extorting payments from a

citizen in return for agreeing to use his influence to secure

the passage of a favorable zoning amendment. Id. at 364-65.

Once again, the Court held that some duties are inherent in the

6
 The defendants in Deegan were charged with violating N.J.S.A.
2A:85-1 (repealed 1979), which read:

 Assaults, batteries, false imprisonments,
 affrays, riots, routs, unlawful assemblies,
 nuisances, cheats, deceits, and all other
 offenses of an indictable nature at common
 law, and not otherwise expressly provided
 for by statute, are misdemeanors.

 32 A-0483-16T4
office of a public attorney. Id. at 368-69. Those duties — to

render uncorrupted legal advice and refrain from extortion in

return for rendering that advice — are inseparable from properly

performing the tasks of the office. See, e.g., State v. Green,

376 A.2d 424, 428 (Del. Super. Ct. 1977) ("The phrase 'a duty

which . . . is clearly inherent in the nature of his office'

means those unspecified duties that are so essential to the

accomplishment of the purposes for which the office was created

that they are clearly inherent in the nature of the office.")

(quoting Del. Code Ann. tit. 11, § 1211(2)). Neither Deegan nor

Weleck support the State's position that defendant's official

duties included a non-discretionary duty, while at home on

vacation, to notify police of Prontnicki's whereabouts. It is

only "unlawful behavior in relation to official duties" that

give rise to the charge of official misconduct. Mason, supra,

355 N.J. Super. at 301 (emphasis added) (citing State v. Winne,

12 N.J. 152, 176 (1953)).

 In Sheridan v. Sheridan, 247 N.J. Super. 552, 565 (Ch. Div.

1990), while recognizing the absence of any controlling court

rule or administrative directive, the Family Part observed that

most judges report "illegal or improper activities . . . because

it is the right thing to do and because it is repugnant to their

oath that judges sit mute in the face of acknowledged,

 33 A-0483-16T4
demonstrated or potential wrongdoing." Notably, in Sheridan,

the judge became aware of criminal wrongdoing during sworn

testimony in a case over which he was presiding, i.e., while the

judge was performing an official duty. Id. at 563. More

importantly, Sheridan was firmly rooted in a judge's ethical

responsibilities, see id. at 563-66, and the court never

suggested that the judge's failure to make such a report would

subject him or her to criminal culpability.

 The State next turns to Canons One and Two of the Code for

support. Canon One provides, "An independent and honorable

judiciary is indispensable to justice. A judge therefore shall

uphold and should promote the independence, integrity and

impartiality of the judiciary." Canon Two states, "[a] judge

should avoid impropriety and the appearance of impropriety in

all activities." The Rules associated with Canon One require a

judge to "personally observe[] high standards of conduct" and

"respect and comply with the law."7

7
 The State has not argued that defendant refrained from
performing a duty inherent in her office — complying with the
law — because she committed the crime of hindering. We have
rejected similar arguments involving other officials. See e.g.,
Kueny, supra, 411 N.J. Super. at 406-08 (rejecting the
proposition that every crime committed by a police officer,
including refraining from returning stolen property, was
official misconduct); Thompson, supra, 402 N.J. Super. at 201
("reject[ing] the use of a general 'duty to perform other duties
in good faith' as a means to impose criminal liability") (citing
 (continued)

 34 A-0483-16T4
 It is the duty of every judge "to abide by and enforce" the

Code. In re DiLeo, 216 N.J. 449, 467 (2014) (citing R. 1:18).

In dicta, we recognized that the Code "specifically deal[s] with

the duties of judicial office and could readily be used as a

basis for describing the duties inherent in that office."

Thompson, supra, 402 N.J. Super. at 201. However, the Court

characterized an earlier version of the Code as "a general

statement of standards and goals, admirably serving the purpose

of providing guidance to judges in all matters precisely because

of the generality of its provisions." In re Alvino, 100 N.J. 92,

102 (1985) (emphasis added). "While judges are expected to

adhere to the Code, every breach 'does not mean . . . that

judicial misconduct has occurred, or that discipline . . . is

appropriate.'" DiLeo, supra, 216 N.J. at 468 (quoting Alvino,

supra, 100 N.J. at 96). It surely follows that not every breach

of the Code subjects a judge to criminal prosecution. In the

absence of any reported New Jersey case holding the Code's

"general statements" of ethical conduct are a declaration of

(continued)
People v. Garson, 848 N.E.2d 1264 (N.Y. 2006); see also State v.
Imbriani, 291 N.J. Super. 171, 183 (App. Div. 1996)
(specifically refusing to consider whether "crimes committed by
a Superior Court Judge outside of his official duties constitute
a breach of the public trust" under guidelines for the Pre-trial
Intervention Program).

 35 A-0483-16T4
inherent judicial duties, we consider some decisions from our

sister states.

 In People v. La Carrubba, the defendant judge was charged

with refraining from performing a duty inherent in her office by

improperly dismissing a friend's traffic ticket. 389 N.E.2d

799, 801 (N.Y. 1979). In interpreting a provision identical to

N.J.S.A. 2C:30-2b, reversing the defendant's conviction and

dismissing the indictment, the court said "the Code of Judicial

Conduct and the Penal Law serve discrete, if in some respects

complimentary, purposes." Id. at 802. Recognizing the penal

code clearly defined acts or omissions that violated the law,

the court said:

 Couched in the subjunctive mood, the code is
 a compilation of ethical objectives and
 exhortations for the violation of which
 recourse has traditionally been had to
 disciplinary rather than criminal
 proceedings. If in any instance the conduct
 proscribed by the canons also independently
 constitutes a criminal offense under the
 Penal Law (e.g., bribe receiving, [New York]
 Penal Law, § 200.12) then, of course, the
 sanctions of the Criminal Law are available
 and the coexistence of ethical impropriety
 would stand as no barrier to criminal
 prosecution. Taken alone, however, instances
 of ethical impropriety, although
 unquestionably to be condemned, provide no
 predicate for the imposition of criminal
 penalties.

 [Ibid.]

 36 A-0483-16T4
 In Garson, the court reversed the dismissal of an

indictment charging the defendant judge with violating New York

Penal Law § 200.25, receiving a reward for official misconduct

by violating his duty as a public servant, but affirmed

dismissal of the indictment charging a violation of § 195.02(2).

848 N.E.2d at 1265. In that case, the defendant received

various gifts from an attorney in return for referring cases, in

violation of the Rules of Judicial Conduct enacted in New York

following constitutional amendment and pursuant to an express

legislative grant of power to the court. Id. at 1268, 1272.

The Garson court distinguished La Carrubba in two ways.

 First, the court recognized the mandatory nature of New

York's Rules of Judicial Conduct, as opposed to the earlier code

of conduct. Id. at 1271-74. Second, the court recognized that

§ 200.25 rested "not on a violation of the Rules alone but on

the acceptance of a benefit for violating an official duty

defined by the Rules." Id. at 1273. "Had the judge as a public

servant violated ethical duties alone -- without accepting a

benefit for the violation -- and had the action not otherwise

been prohibited by the Penal Law, the public servant would be

subject only to discipline in a proceeding brought by the

Commission on Judicial Conduct." Ibid. (emphasis added).

 37 A-0483-16T4
 Delaware, which also criminalizes the failure to perform a

duty inherent in a public office, has limited the use of ethical

standards to define criminal conduct. See, e.g., Green, supra,

376 A.2d at 428 (concluding a duty "inherent in the nature of [a

public servant's] office . . . does not include the duty of

avoiding violation of unspecified conflict-of-interest or other

ethical standards").

 Some states that criminalize the performance of

unauthorized acts or acts in excess of official powers, as does

N.J.S.A. 2C:30-2a, have rejected application of ethical

guidelines to define the nature and scope of the official duties

of an office. See, e.g., State v. Serstock, 402 N.W.2d 514, 516

(Minn. 1987) (concluding the code of professional responsibility

and city ethics code could not be used to define the "lawful

authority" of a municipal prosecutor accused of official

misconduct for dismissing a friend's traffic tickets); Clayton

v. Willis, 489 So. 2d 813, 815-16 (Fla. Dist. Ct. App. 1986)

(rejecting violations of the state Code of Judicial Conduct as a

basis for judge's alleged criminal misconduct in fraudulently

abusing and exceeding his powers).

 As the motion judge noted, the Code does not expressly

include a duty to enforce another court's warrant. The State

cites Code of Conduct for Judiciary Employees, Canon 1G (2014),

 38 A-0483-16T4
which provides, "No court employee shall refuse to enforce or

otherwise carry out any properly issued rule or order of court."

However, that Code, which in this instance directs the

ministerial duties of judiciary personnel, does not apply to a

judge. Similarly, the State's reliance on Administrative

Directive #14-06, "Probation Field Supervision and Safety

Standards," (August 3, 2006), is unavailing. That directive,

which also does not apply to judges, instructs probation

officers to cooperate with law enforcement in the supervision of

probationers and in effecting the arrest of violators.

 Unequivocally, "[i]t is the judge's obligation to see that

justice is done in every case that comes before him [or her]."

In re Yaccarino, 101 N.J. 342, 388 (1985) (quoting In re Albano,

75 N.J. 509, 514 (1978)). A judge must live by this humble

maxim, one that, as most sitting judges would agree, is more

easily stated than realized. The Code codifies this ideal and

provides guidance for the conduct of each judge as he or she

performs his or her duties. A judge who refrains from

performing her official duty in a case that comes before her,

coupled with the purpose to bestow a benefit on herself or

another, subjects herself to criminal prosecution for official

misconduct. This is not such a case.

 39 A-0483-16T4
 We do not mean to imply that a judge may only commit

official misconduct by refraining from performing a duty while

in the courtroom. A judge is exercising her official duties,

for example, while "on call" or on "emergent duty," outside of

the courtroom and after normal work hours. We have no doubt

that if, for example, a judge were to refrain from authorizing

a search warrant despite being presented with ample probable

cause because it involved a personal friend, she would have

committed official misconduct under N.J.S.A. 2C:30-2b. And,

certainly a judge may violate N.J.S.A. 2C:30-2a by affirmatively

committing acts unauthorized by his office or in an unauthorized

manner in many ways outside of the courthouse and at all hours.

 N.J.S.A. 2C:30-2b criminalizes only the omissions of "a

[judge] who consciously refrains from performing an official

non-discretionary duty, which duty is imposed upon him by law or

which is clearly inherent in the nature of his office. In

addition, the public servant must know of the existence of such

non-discretionary duty to act." Kueny, supra, 411 N.J. Super.

at 406 (emphasis added) (quoting Final Report, supra, at 291).

The State has cited no authority supporting the contention that

a judge has a non-discretionary duty to enforce the order of

another court, and it certainly has failed to demonstrate such a

duty is ever present, obligating the judge to perform the duty

 40 A-0483-16T4
wherever he or she may be, twenty-four hours a day, 365 days per

year.

 At oral argument, the State adopted the proposition that a

judge would commit official misconduct if, knowing an arrest

warrant based on a family member's failure to pay outstanding

parking tickets had issued, the judge refrained from notifying

police of that family member's whereabouts. No provisions of

the Code or any other authority, however broadly read, would

sustain a charge of official misconduct based on those facts.

The facts presented to this grand jury were not much different.

 In affirming dismissal of the official misconduct count, we

do not condone in any way defendant's alleged conduct, nor does

it relieve defendant of the potential serious consequences if

convicted of the crime of hindering. The Court has repeatedly

exercised its power to discipline judges for their conduct,

criminal or unethical, official or otherwise. It has the power

to remove a judge from office "for misconduct in office, willful

neglect of duty, or other conduct evidencing unfitness for

judicial office, or for incompetence." N.J.S.A. 2B:2A-2. We

further note that if defendant were convicted of third-degree

hindering Prontnicki's apprehension, she would forfeit her

office. N.J.S.A. 2C:51-2a(1).

 41 A-0483-16T4
 We affirm the dismissal of count one of the indictment

charging defendant with official misconduct.

 Affirmed in both appeals. We remand the matter to the Law

Division for further proceedings consistent with this opinion.

We do not retain jurisdiction.

 42 A-0483-16T4