986 A.2d 703 (2010)
411 N.J. Super. 392
STATE of New Jersey, Plaintiff-Respondent,
v.
Scott S. KUENY, Defendant-Appellant.
A-2812-07T4
Superior Court of New Jersey, Appellate Division.
Submitted September 16, 2009.
Decided January 26, 2010.
*705 F. Michael Daily, Jr., LLC, Westmont, for appellant (F. Michael Daily, Jr., on the brief).
Anne Milgram, Attorney General, attorney for respondent (Deborah Bartolomey, Deputy Attorney General, of counsel and on the brief).
Before Judges STERN, SABATINO and HARRIS.
The opinion of the court was delivered by
STERN, P.J.A.D.
Defendant was convicted by jury of fraudulent use of a credit card, N.J.S.A. 2C:21-6h (count one), and third degree misconduct in office, N.J.S.A. 2C:30-2b (count two). He was sentenced to concurrent terms of four years probation with conditions. He also forfeited his office as a police officer.[1]
Through the use of the victim's card which had been left in an ATM machine, defendant obtained $100. He testified that he didn't know the card had been left in the machine and that because of glare from the sun and problems he was having with his children,[2] he accidentally hit the automatic $100 withdrawal button, and that when he realized what he had done, left the victim's ATM card for the owner to retrieve because it could not be used by others without a PIN. He then withdrew $320 through his own ATM card and asserts that the police got to him before he could report that the victim left her card in the machine and the accidental withdrawal of her money. However, eleven days elapsed in between.
Defendant argues that the conviction must be reversed because a mistrial should have been declared when the jury observed him suffer a medical condition it could have thought was feigned for sympathy and that the judge's charge on the subject was inadequate. He further asserts *706 his conduct did not constitute official misconduct, but he doesn't contest that the credit card conviction alone warrants the forfeiture.[3] Defendant specifically contends that "... assuming that the defendant did breach a `police duty' to care for the property of another the breach of such a duty was not charged in the indictment nor was such a breach submitted to the jury," because the instructions were premised on the belief "that any time a police officer commits a crime he ergo also commits official misconduct." He asks for reversal of the misconduct conviction and entry of a judgment of acquittal thereon, and a new trial on count one to include instructions on a lesser included theft offense.
Independent of his first point concerning the medical condition, the State contends that both convictions are unassailable. It specifically asserts that "an off-duty police officer ... had the duty to bring the ATM card to the nearest law-enforcement agency, had another duty not to run a balance inquiry on the card and yet another duty to leave the funds in someone's else's account untouched." Certainly, an officer, even as here off-duty and outside his jurisdiction while vacationing in another New Jersey municipality, has duties beyond those of a private citizen. However, the critical issue before us is whether defendant's actions constituted misconduct in office and, if so, whether the jury charge was adequate.

I
Defendant was a police officer in the Mount Laurel Township Police Department. On the evening of Saturday, July 1, 2006, defendant was nearing the end of a week-long vacation in Ocean City with his wife and three young children, along with a babysitter. The family planned to have dinner at the Mack & Manco Pizza restaurant. Defendant dropped his wife, his youngest child, and the babysitter at the restaurant slightly before 6:00 p.m., and then went with his two older children, then ages four and seven, to a branch of the Fox Chase Bank in Ocean City to obtain cash for dinner. The children were argumentative because they wanted to go directly to the boardwalk amusements as it was their last night of vacation.
At approximately the same time, Ms. P.[4] went to the Fox Chase Bank to make a withdrawal from the ATM machine. The testimony of Ms. P., records from the Fox Chase Bank ATM machine, and the ATM's surveillance videotape establish that Ms. P. began her ATM session at 6:12 p.m. by reviewing the balance of her checking account, which she noted was $132. Ms. P. had great "difficulty reading the screen" due to the glare of the sun. She then withdrew $20 at 6:14 p.m. After this transaction, she noted that $112 remained her account. She was "very frustrated" at that point because she "couldn't see" the screen, and left the bank without realizing that she had failed to end her ATM session and that her ATM card remained in the machine.
The testimony of police officers who interviewed the defendant, records from the ATM machine, and the ATM's surveillance tape reveal that at 6:15 p.m., less than a minute after Ms. P. left, the defendant walked up to the ATM machine. He conducted a balance check of Ms. P.'s account and within the next minute, withdrew $100 from that account. At 6:17 p.m., he made *707 a $320 withdrawal from his own checking account, which left a balance of $1,715.30 in defendant's account.
The defendant testified that he did not know that Ms. P.'s card was in the ATM machine, and because of the glare of the sun shining on the screen and the "distraction[s]" caused by his children "fighting" and a cell phone call from his wife to "hurry up," he accidentally hit the automatic $100 withdrawal button. He then claims to have realized that he had made a withdrawal from someone else's account, and left the ATM card for the owner to retrieve because it could not be used by others without the PIN number.
On the next day, July 2, 2006, Ms. P. checked her account and discovered that she only had a balance of $12, rather than the $112 she had expected. On Monday, July 3, 2006, Ms. P. completed an affidavit at the Fox Chase Bank in which she reported that there had been an unauthorized withdrawal of $100 from her checking account. The bank reimbursed Ms. P. three weeks later.
The defendant also testified that he planned to return the $100 to the Fox Chase Bank, but he had not done so by July 12, 2006, eleven days after the withdrawal, when he was contacted by the Ocean City Police about the $100 that had been withdrawn from Ms. P.'s account. He subsequently gave a statement to the police.

II
The defendant contends that the trial judge should have granted a mistrial when he suffered a "medical episode" after both sides had rested and completed their summations. Specifically, defendant argues that a mistrial was necessary because the court was faced with an "irregular matter" that had the capacity of influencing the result of the case because the jury might have thought it had been subjected to a "cheap trick" by defendant, which thinking would have prevented him from receiving a fair trial.
After the summations were concluded, the judge called counsel to sidebar "quickly." The purpose was apparently to inform them that he planned to deliver the charge to the jury the next day. At sidebar, the judge asked if defendant was "all right," and defense counsel answered "it happened one time before." The judge then told the jury he would give his charge "tomorrow morning" and discharged the jury for the night.
The next morning defense counsel advised the court that defendant's wife told counsel that defendant's heart had stopped at the end of summations. The judge described what he had observed the day before:
Mr. Herlihy [the prosecutor] completed his closing argument. I asked counsel to approach the bench ... I observed the Defendant somewhat listing to my left, would have been his right, directed that circumstance to the attention of counsel and with that, some degree of confusion broke out. The Defendant's wife came forward. The sheriff's officers got involved. Assistance was called. EMTs arrived. First aid was administered. The jury did not see all of that. At the point in time that it became clear that the Defendant was in some degree of distress I directed the jury to be removed and they were. They were removed rather quickly. Nonetheless, the jury did have the opportunity to observe the early seconds of that episode. And the question then becomes what effect, if any, does or should the jury, having had that observation, have upon the completion of this particular matter. First, I want to note that the Defendant is here, and that is *708 the most important circumstance. And I'm advised by Mr. Quinlan [defense counsel] that he was treated last night, released and is fine. When I say fine, I mean at least sufficiently fine to be released, to not be held for observation and to be here today. And that is certainly a good thing. Second, the jury is here. They have gathered and they are awaiting further word from me. Counsel appeared at my chambers this morning and requested an audience with me to discuss this unusual circumstance.
Defense counsel thereafter recited his version of the event:
The truth is that thanks to the prompt CPR administered by Detective Sergeant Steven Demofonte, of the Mount Laurel Police, who's been an observer, and thanks to the immediate administration of CPR by Scott's brother, who's a Willingboro officer, and thanks to the availability of the defibrillator, they were able to keep him, or revive him, or whatever. My understanding is that he had no pulse. That was a comment that was made by your sheriff's officer. My understanding is Ms. Kueny  Mrs. Kueny was at the hospital, she talked with Doctor Nussy. Doctor Nussy indicated that his heart had stopped, but that they had checked him out and he was okay. They released him. My concern, Your Honor, is that the potential for prejudice, if this jury is not made aware of the truth, which is that this was not some cheap trickery, some cheap courtroom theatrics, 
Defense counsel then asked the judge to "consider a mistrial because we had some drama here." He alternatively suggested a comprehensive voir dire of the jurors or instructions to the panel. Counsel concluded:
So what we're left with is a very difficult situation, Your Honor, that I would hope could be cured simply by saying, ladies and gentlemen, it was a legitimate medical emergency that was dealt with heroically by our staff and he's okay. But they have to be told it was a legitimate medical emergency, or whatever words Your Honor uses, to wipe out that suspicion of cheap courtroom theatrics.
The prosecutor added the following:
I note that there was  there has been, and it is today, continued a large contingent on behalf of Mr. Kueny in the courtroom. And a significant proportion of those individuals made it through the gate and to the front area of the courtroom to provide, if not medical assistance, moral support, an interest in the case. They ran  they all ran forward and they had already run forward by the time the jury was involved in being processed out of the courtroom. But, certainly, I was checking the jury more than the Defendant at that point of time, because he was sort of surrounded by his friends and people in the courtroom, and they were filing out at that juncture. And my concern is that, in this particular case, where an opening  the defense was that this officer wouldn't have acted in the manner consistent with what the testimony, I believe, reflects and throw his career away for this $100.00 theft, and that the Defendant, essentially, claimed that he cried after learning that he had been charged, and I believe that at least some degree of the defense in this case is sympathy; sympathy for the Defendant, sympathy for the Defendant's family. The wife testified in this matter. The children, the three young children, of the Defendant were present for the first three days of this trial. I don't if they are present today; they're not in the courtroom. And I submit that one of the people that was the first through to her husband, naturally, was *709 the Defendant's wife. And certainly, the jurors had an opportunity to see that. And I'm concerned that there might be unwarranted sympathy towards the Defendant....
The prosecutor was also concerned that he would have no remedy if there was an acquittal whereas defendant could appeal if convicted.
Both counsel stated that a mistrial was appropriate. In the words of defense counsel:
[T]he Court has a Hobson's choice. If you downplay it, I think my client's prejudiced. If you say to the jury, ladies and gentlemen, there was a legitimate medical problem, however you phrase it, the State may be prejudiced. I think perhaps it might be appropriate for the Court to grant a mistrial.
The judge denied a mistrial, stating:
The jury did see the first seconds of the confusion that occurred. But my recollection of what the jury actually saw, and I did my best to be aware of that, was your client essentially leaning over in his chair and ultimately, my recollection was, he was assisted to a supine position on the floor. The table was moved, people advanced, the jury was taken out of the courtroom. So, clearly they know something occurred, but I don't know  well, I'm reasonably satisfied that the jury did not have any opportunity to see anything more graphic than that and not much more graphic than that actually occurred. I stayed in the courtroom until your client was safely on his way to the hospital. I am not able to find, on those circumstances, that manifest injustice would occur were this matter to proceed. I am reasonably satisfied that a clean curative instruction will be sufficient.
The judge thereafter reviewed a proposed charge with counsel. Defendant objected in the absence of an affirmative statement that the defendant suffered a "cardiac incident," "something to let them know that this wasn't fakery." The prosecutor thought the proposed charge, as drafted, constituted "an appropriate charge at this juncture" and noted that he wasn't "faking." The judge believed his charge would be "neutral on both sides."
When the jury entered the room, after asking if the jurors heard or read anything about the case, the judge commenced his final instructions. He started by charging:
Ladies and gentlemen, yesterday afternoon, at the conclusion of closing arguments, you had occasion to witness an episode of what we are advised was illness on the part of the Defendant. As you can see, the Defendant is with us this morning. He has been treated, he is fine. I begin my final charge to you with this initial instruction, that you must disregard that episode entirely. It has no relevance to the evidence in this case. it has no relevance to the issues that you must decide. What you saw, what you heard regarding that episode are not evidence. You must deliberate only the evidence developed in this case. I know you will do that.
We conclude that the judge did not abuse his discretion in denying defendant's motion for a mistrial.[5] This is particularly true because the judge gave an instruction to the jury that was adequate to avoid any prejudice. See United States v. Bailey, 675 F.2d 1292, 1297 (D.C.Cir.1982) (trial judge was in best position to make decision that a defendant's courtroom seizure did not prejudice co-defendants); State v. Boldue, *710 822 A.2d 184, 185-87 (R.I.2003) (no mistrial when assault victim suffered seizure during defense counsel's cross-examination because trial judge assessed possible prejudice and charged jury "not to take into consideration" that the victim "had what he described as a seizure"); People v. Collins, 752 P.2d 93, 94, n. 2 (Colo.1988) (mistrial granted when criminal defendant suffered an epileptic seizure while testifying at a bench trial, but no mistrial during retrial when defendant had seizure outside presence of the jury, although the jury knew of the later incident); Dodson v. State, 502 N.E.2d 1333, 1337-38 (Ind.1987) (defendant's seizure in front of jury during criminal trial was not so prejudicial as to render trial unfair because "[t]he jury's exposure to the incident was brief, and the trial judge's directions were straightforward and appropriate"); State v. Brown, 322 So.2d 211, 218 (La. 1975) (denial of mistrial affirmed; criminal "defendant's seizure did not cause such prejudice as would warrant the declaration of a mistrial"; no jury admonition requested); Curtis v. State, 150 Tex.Crim. 123, 199 S.W.2d 509, 509-10 (1947) (mistrial unnecessary when defendant returned to court the day following a seizure in "apparently in as good condition as he was" prior to the attack).
The court's curative instruction was adequate because it suggested that defendant did suffer some medical event or "illness" and was "treated," and, in any event, specifically instructed the jury to disregard the episode, that it was not relevant to the issues in the case, and that it was not evidence in the case. See State v. Hill, 49 Or.App. 297, 619 P.2d 671, 672-73 (1980) (rape victim's seizure while testifying did not prejudice defendant when victim then continued to testify for an extensive period and at the conclusion of testimony trial judge charged jury to not be influenced by "what appeared to be a seizure on the witness stand"); Chidester v. Dabney, 944 S.W.2d 219, 221 (Mo.App.1997) (civil action; defendant collapsed during trial; no abuse of discretion in denying mistrial; curative instruction adequate). See also State v. Vallejo, 198 N.J. 122, 135-36, 965 A.2d 1181 (2009) (discussing cure by immediate instructions); State v. Papasavvas, 163 N.J. 565, 613-14, 751 A.2d 40 (2000) (curative instruction in capital case adequate).
Here, the trial judge, who "has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting," State v. Winter, 96 N.J. 640, 647, 477 A.2d 323 (1984), concluded that a curative instruction was adequate to preserve a fair trial, and his decision is entitled to deference. Ibid. Such a decision is subject to reversal only for abuse of discretion. Ibid. The judge was "reasonably satisfied that a clean curative instruction [was] sufficient." The grant of a mistrial is a matter of discretion, State v. LaBrutto, 114 N.J. 187, 207, 553 A.2d 335 (1989), and in the absence of an abuse of discretion or undue prejudice based on the instructions given, we reject defendant's contention that a new trial is required.

III
N.J.S.A. 2C:30-2 provides:
A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner;[6] or

*711 b. He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.
[N.J.S.A. 2C:30-2.]
Defendant was indicted for, and convicted of, violating N.J.S.A. 2C:30-2b. The three elements required to establish a violation of N.J.S.A. 2C:30-2b are that "(1) the defendant was a public servant; (2) the defendant knowingly refrained from performing a duty which is imposed upon him or her by law or which is clearly inherent in the nature of the office; and (3) the defendant's purpose in so refraining was to benefit himself or herself or to injure or deprive another of a benefit." State v. Thompson, 402 N.J.Super. 177, 195-96, 953 A.2d 491 (2008) (citing Model Jury Charge (Criminal), "Official Misconduct" (N.J.S.A. 2C:30-2) (Revised 9/11/06)).
Misconduct in office or official misconduct has been defined as "unlawful behavior in relation to official duties by an officer entrusted with the administration of justice or who is in breach of a duty of public concern in a public office." State v. Mason, 355 N.J.Super. 296, 301, 810 A.2d 88 (App.Div.2002) (citing State v. Winne, 12 N.J. 152, 176, 96 A.2d 63 (1953)). The purpose of N.J.S.A. 2C:30-2 is to "prevent the perversion of governmental authority." State v. Perez, 185 N.J. 204, 206, 883 A.2d 367 (2005).
Defendant was not indicted or convicted for violating N.J.S.A. 2C:30-2a, which requires an affirmative act. The State claims that the defendant violated N.J.S.A. 2C:30-2b by not returning the victim's ATM card and by keeping her money. The indictment alleged that on July 1, 2006, in the City of Ocean City, the defendant,
"being a public servant, that is a police officer, and acting with purpose to obtain a benefit to himself and/or deprive another of a benefit, did refrain from performing a duty imposed upon him by law, or clearly inherent in the nature of his office, that is, he knowingly did make an unauthorized ATM withdrawal from the account of [Ms. P.] without her knowledge and/or permission and kept the proceeds from that transaction, namely $100"
The unauthorized ATM withdrawal is an affirmative act, but it had nothing to do with the "exercise of his official functions." In any event for present purposes, we focus on the allegation that defendant "kept the proceeds" and failed to return Ms. P.'s $100, an allegation that he failed to take an action required by his official duties.
It is clear that there is sufficient evidence in the record to sustain the first element of N.J.S.A. 2C:30-2b, that the defendant was a public official, and the third element, that the defendant's purpose in refraining from doing an act was to benefit himself or to injure or deprive another of a benefit. Defendant argues that a breach of official duty was not "charged in the indictment nor was such a breach submitted to the jury." He further contends the evidence did not support a conviction under the second element (which requires that it be shown that the defendant "refrain from performing a duty which is imposed upon him by law or is clearly inherent in the nature of the office") and that the State did not demonstrate that he *712 was under any obligation greater than that of an ordinary citizen to return the victim's $100.
The defendant's oath as a police officer to defend and obey the laws of New Jersey, in of itself, does not make him strictly liable for official misconduct for all crimes he may commit. The Supreme Court has stated that, although the oath of office "is a necessary condition to assumption of office, of itself it creates no particular duty, transgression of which" would be indictable. See State v. Silverstein, 41 N.J. 203, 205, 195 A.2d 617 (1963). Nor was there introduced into evidence any statute, Mount Laurel Police Department standard operating procedure, order, rule or regulation which prescribed that a police officer had a duty to return lost money that is discovered while the officer is off-duty, on vacation or outside of Mount Laurel. In New Jersey "`the fundamental duty of a policeman ... is to be on the lookout for infractions of the law and to use due diligence in discovering and reporting them.'" Ballinger v. Del. River Port Auth., 172 N.J. 586, 604, 800 A.2d 97 (2002) (quoting City of Asbury Park v. Dep't of Civil Serv., 17 N.J. 419, 429, 111 A.2d 625 (1955) (brackets omitted)). However, as a rule "a governing body can directly exercise its police power only within its jurisdictional boundaries, absent a statute broadening those powers." State v. Cohen, 73 N.J. 331, 342, 375 A.2d 259 (1977).
The jurisdiction of officers of New Jersey municipal police departments is generally limited to "within the territorial limits" of their municipalities. N.J.S.A. 40A:14-152. An exception to this rule is that a municipal police officer has "full power of arrest for any crime committed in said officer's presence and committed anywhere within the territorial limits of the State of New Jersey." N.J.S.A. 40A:14-152.1. See State v. White, 305 N.J.Super. 322, 327, 702 A.2d 514 (App.Div.1997); State v. Montalvo, 280 N.J.Super. 377, 381, 655 A.2d 476 (App.Div.1995); see also Barna v. City of Perth Amboy, 42 F.3d 809, 817 (3d Cir.1994).
N.J.S.A. 2C:30-2b reads as it did when the Code of Criminal Justice was first introduced in 1971, with the additional language in the introductory clause regarding the purpose to benefit oneself or deprive another. I Final Report of the New Jersey Law Revision Commission, Report and Penal Code 109 (1971). The Comment to the subsection reads:
Subsection b, the "omission to act" phase of this offense, has reference to a public servant who consciously refrains from performing an official non-discretionary duty, which duty is imposed upon him by law or which is clearly inherent in the nature of his office. In addition, the public servant must know of the existence of such non-discretionary duty to act. Thus, such duty must be either one that is imposed by law, or one that is unmistakably inherent in the nature of the public servant's office, i.e., the duty to act is so clear that the public servant is on notice as to the standards that he must meet. In other words, the failure to act must be more than a mere breach of good judgment. In the absence of a duty to act, there can be no conviction.
[II Final Report of the New Jersey Law Revision Commission, Commentary 291 (1971).]
The proposition that it is an inherent duty of every police officer to obey the law, and therefore police officers are strictly liable under N.J.S.A. 2C:30-2 for the commission of any crime, is forestalled by precedent. "[N]ot every offense committed by a public official involves official misconduct." State v. Hinds, 143 N.J. 540, *713 549, 674 A.2d 161 (1996). To be guilty of a violation of N.J.S.A. 2C:30-2, the defendant must be shown to have committed misconduct that is "sufficiently related to the officer's official status." Id. at 546, 674 A.2d 161. A public servant's private misconduct cannot be punished as official misconduct; the private misconduct can only be punished to the extent that the same conduct by a private citizen can be punished. Hinds, supra, 143 N.J. at 549, 674 A.2d 161; Cannel, New Jersey Criminal Code Annotated, comment 4 on N.J.S.A. 2C:30-2 (1999).[7]
Stated differently, the misconduct must somehow relate to the wrongdoer's public office. There must be a relationship between the misconduct and public office of the wrongdoer, and the wrongdoer must rely upon his or her status as a public official to gain a benefit or deprive another. State v. Corso, 355 N.J.Super. 518, 526, 810 A.2d 1130 (App.Div.2002) (off duty officer has a duty to arrest persons committing a crime in the officer's presence; conviction upheld), certif. denied, 175 N.J. 547, 816 A.2d 1048 (2003). See also State v. Bullock, 136 N.J. 149, 157, 642 A.2d 397 (1994) (suspended officer displayed State Police identification card to his victims; conduct sufficiently related to office to constitute misconduct); State v. Mason, supra, 355 N.J.Super. at 305, 810 A.2d 88 (dismissal of misconduct count affirmed; defendants were private citizens performing services pursuant to government contracts); Cannel, New Jersey Criminal Code Annotated, comment 4 on N.J.S.A. 2C:30-2 (collecting cases).
The fraudulent use or theft by the illegal use of another person's ATM card by a police officer, without more, does not constitute misconduct in office. The defendant in this case simply did not use his status as a police officer to commit the crime of fraudulent use of a credit card. Accordingly, we reverse the indictment for third degree misconduct in office, N.J.S.A. 2C:30-2b. See State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967).[8]

IV
We summarily reject defendant's argument that the judge should have charged the disorderly persons offense of theft under N.J.S.A. 2C:20-6. He had no obligation to do it without request, particularly because it is not a lesser included offense even if deemed a "related lesser offense." In any event, whether he should have charged it upon defendant's request is not before us. See State v. Thomas, 187 N.J. 119, 129-134, 900 A.2d 797 (2006); State v. Robinson, 136 N.J. 476, 489-92, 643 A.2d 591 (1994); State v. Smith, 136 N.J. 245, 251-53, 642 A.2d 978 (1994).

V
N.J.S.A. 2C:51-2(a)(1) requires that a public official forfeit office if convicted of a crime "involving dishonesty" or a crime of the third degree or higher. Defendant does not contend that his conviction only for third-degree theft based on fraudulent use of a credit card affects the forfeiture. We affirm the conviction for theft and reverse the conviction for misconduct in *714 office and remand for correction of the judgment of conviction.
NOTES
[1] The sentencing transcript has not been provided on the appeal.
[2] The judgment reflects the judge's following evaluation of defendant's credibility in assessing aggravating and mitigating factors: "defendant's claim of distraction by his infant sons at the time of the offense is not supported by the videotape introduced at trial. Defendant's demeanor warrants concern regarding prospects of successful and lasting completion of probation."
[3] According to the judgment, the forfeiture was ordered based on the conviction on both counts. No issue is raised with respect to the sentence.
[4] We use only the initial P. to protect the victim's privacy.
[5] We need not consider if defendant actually moved for a mistrial in light of his view that curative instructions, if adequate, would suffice.
[6] Despite the indictment for a violation of N.J.S.A. 2C:30-2b only, we quote subsection -2a to juxtapose that subsection's affirmative conduct requirement with subsection b's passive inactivity and as background for our discussion on the jury charge.
[7] "At oral argument [in Hinds, supra, 143 N.J. at 549, 674 A.2d 161], the Attorney General urged [the Court] to accept an expansive interpretation of 2C:30-2 that might possibly subject police officers to liability for official misconduct whenever they violate the law," and the Court clearly rejected this approach. Id.
[8] As a result, we need not develop concerns about the jury charge which included factors relevant to subsection -2a as well as subsection -2b.