NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0117-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTHONY L. GIBSON, a/k/a
ANTHONY GIBSON,

    Defendant-Appellant.

APPROVED FOR PUBLICATION
AS REDACTED

December 19, 2025

APPELLATE DIVISION

Argued December 1, 2025 – Decided December 19, 2025

Before Judges Sabatino, Natali and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 19-06-1759, 19-07-1907 and 22-01-0099.

Rachel Glanz, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Rachel Glanz, of counsel and on the briefs).

Matthew E. Hanley, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Essex County Prosecutor, attorney; Matthew E. Hanley, of counsel and on the briefs).

Peter Quinn argued the cause for amicus curiae The Association of Criminal Defense Lawyers of New

Jersey (Lowenstein Sandler LLP, attorneys; Scott B. McBride and Peter Quinn, on the brief).

Brian Uzdavinis, Deputy Attorney General, argued the cause for amicus curiae Attorney General (Matthew J. Platkin, Attorney General, attorney; Brian Uzdavinis, of counsel and on the brief).

Appellant filed a supplemental brief on appellant's behalf.

The opinion of the court was delivered by

SABATINO, P.J.A.D.

After a jury trial, defendant Anthony Gibson, a police officer, was found guilty of theft by unlawful taking and official misconduct. The trial court imposed five-year concurrent sentences on these offenses, as well as concurrent sentences on defendant's guilty plea to other unrelated offenses in separate indictments.

As we will elaborate, defendant, a detective with the Newark Police Department ("NPD"), began taking paid administrative sick leave in March 2018. The NPD policies prohibited officers on sick leave from engaging in any outside employment. However, defendant worked at a second job as a security guard at St. Michael's Hospital on multiple occasions during his period of leave. He had previously been approved to work that second job before taking sick

A-0117-23

leave.  The State argued that on those days, defendant illegally took his full salary from the NPD, to which he was not entitled under the policies.

Among other things, defendant argues that his motion for acquittal should have been granted as to the official misconduct charge because his violation of internal NPD policies did not amount to an unauthorized exercise of his official functions.

For the reasons set forth in the published portion of this opinion, we reverse and vacate defendant's conviction of official misconduct under N.J.S.A. 2C:30-2(a) on count two because there is inadequate evidence that defendant's receipt of sick pay in violation of the NPD's leave policies constituted "an unauthorized exercise of his official functions" as a police officer.  We affirm, however, defendant's conviction of theft in count one.  We reject defendant's other arguments in the unpublished portion of this opinion.

We remand the case to the trial court for resentencing and to address other specified matters in light of our disposition.

I.

We summarize the facts and procedural history, with particular focus on the matters most relevant to defendant's conviction of official misconduct.

A.
(NPD's Policies and Procedures)

3

## Sick Leave

Pursuant to an internal policy, the NPD provides unlimited, fully paid sick leave for injured or ill employees. The policy requires an officer who calls out sick to stay at home; the NPD must call the officer at least once during the officer's scheduled shift to ensure compliance with this mandate. If the officer does not answer the call, a supervisor is sent to the home for a well-being and compliance check.

An NPD officer may be placed on administrative sick leave when it is expected that the officer will be absent from work for more than five days. Relevant here, officers are considered "injured" when they "incur an on-duty physical infliction which renders [them] unable to capably perform their assigned duties." Officers are "sick" when they are "affected by a physical or mental disorder" which similarly makes it impossible to "capably perform their duties." The officer must provide medical documentation supporting the need for administrative sick leave. Officers on administrative sick leave are not subject to "home confinement status" and are not called or visited while they are out of work.

A-0117-23

Outside Employment

The NPD's outside employment policy permits officers to "supplement their income by engaging in authorized extra duty employment." In 1997, the policy stated that a request to engage in outside employment would be denied if it appeared from "the applicant's sick record or other evidence" that such employment "might impair his ability to discharge his police department obligations." In 1999, the policy was updated to provide that when an officer is "booked off . . . for illness or injury, the permission that is granted for outside part-time employment is automatically rescinded for the duration of the sick leave." Both the former and the updated versions of the policy stated that personnel on sick leave who engage in outside employment "may be committing a criminal act." These relevant provisions remained the same through several further updates to the policy before 2018.

Testimony About the NPD Policies

John Rawa, a former captain with the NPD, testified that outside employment was not permitted for officers on administrative sick leave because an officer's "primary job is to be a full duty police officer." He explained that it was the NPD's position that if an officer "cannot perform [the] functions" of the

A-0117-23

police work to which the officer was assigned, that an officer also "wouldn't be able to be approved for any outside employment work."

Lieutenant John Neves, the executive officer at the NPD's Internal Affairs ("IA") Division, testified that when new policies are introduced or existing ones are updated, the police director writes a memo advising all officers of the change. Prior to 2018, all new or revised policies were disseminated to officers during roll call before a shift began, and the officers were required to sign a roster sheet to acknowledge receipt of a physical copy. Antonio Dominguez, a retired captain of the IA Division, testified that a supervisor's failure to disseminate a policy update would result in discipline.

The director's memo for the updated 1999 version of the outside employment policy provided that the policy would be "distributed to all personnel with the January 6, 2000, payroll checks and shall be [the] subject of roll call training for a period of two weeks." In 2002, another memo related to an update to that policy stated that the policy's contents would again be the subject of roll call training for two weeks.

Neves testified that the IA Division reviews complaints against employees. If a complaint is clearly not "worthy of a criminal investigation," the Division handles the investigation internally, but if a complaint carries an

implication of criminality, it is referred to the Prosecutor's Office. The Prosecutor's Office makes the ultimate determination whether a matter is criminal. According to Neves, the Prosecutor's Office responds to a criminal complaint by either taking over the investigation from the IA Division right away or advising the Division to continue investigating until "certain information" is gathered. The second response is more common.

Neves testified that many officers who violate the NPD's sick leave policy are disciplined administratively, without any referral to the Prosecutor's Office. Dominguez similarly testified that during his time in the IA Division, officers were often disciplined internally for violating the outside employment policy. However, both Neves and Dominguez also said that sometimes criminal charges were filed against officers who did not abide by the policies. They acknowledged on cross-examination that the policies did not explicitly inform officers when a violation would be dealt with as a criminal matter. However, Dominguez said that all officers are expected to be aware of and abide by all NPD policies. He read an internal regulation into the record, which stated that ignorance of a policy was not considered an excuse for a violation.

A-0117-23

## B.
### (Investigation Into Defendant)

Defendant began working for the NPD in 1993 and was promoted to the rank of detective in 1996. In 1997, he was given permission to work a second job as a security guard at St. Michael's. Defendant continued to work at both jobs throughout the rest of his career with the NPD.

In early 2018, defendant was transferred to the Communications Division, which oversees and processes emergency calls. Rawa, who had worked as captain of that unit, testified that officers assigned there perform mostly administrative duties such as answering calls and fulfilling requests for audio recordings. Officers in the Communications Division are not expected to conduct arrests or do other physical police work.

Walter Pagan, who had been the Director of Public Safety, Security, and Emergency Management at St. Michael's from 2006 to 2016 and returned to that position in 2020, testified that when working as a guard at the hospital, defendant was often assigned to the emergency room ("ER"). Pagan explained that the duties of officers in the ER were "high risk" and included deescalating situations with disorderly patients and keeping nursing staff safe. However, Pagan acknowledged that he was not working at St. Michael's in 2018 and did

8

not have knowledge of defendant's specific assignments and duties during that year.

According to Pagan, defendant as a security officer wore a blue "public safety uniform" with a St. Michael's insignia on it. Defendant was armed in that job, although the record does not indicate whether it was his personal firearm. Pagan testified that security officers could not put restraints on combative patients but could hold them down to stop the patients from escaping. If a person was found illegally carrying a weapon, NPD officers would be called in to respond.

On cross-examination, Neves testified that he did not personally know whether defendant was trained on or received copies of the sick leave and outside employment policies. Neves, Rawa, and Dominguez were all unaware of, and the State did not otherwise introduce into evidence, any documents from defendant's file indicating that he had ever signed a roster acknowledging receipt of the policies.

On March 6, 2018, the NPD placed defendant on administrative sick leave. The reason defendant sought sick leave is not fully clear from the record. Defendant testified that he was involved in a car accident at some point prior to March 2018, and that he was thrown down a flight of stairs in the course of his

A-0117-23

work as a detective, resulting in a serious back injury. The State, however, presented evidence showing that defendant's leave record did not reference any injuries and that he had requested sick leave because he was suffering from gout. Regardless, NPD records introduced at trial indicated that defendant was on administrative sick leave from March 6 to November 2, 2018, a period of about seven months.

At some point the IA Division received a criminal complaint against defendant. The nature of this complaint was not described at trial and it is unclear if it was referring to the allegations in the current matter. The IA Division followed its usual practice and contacted the Prosecutor's Office, which advised it to cease investigating and turn over all evidence it had gathered at that point.

Captain Carlos Olmo led the investigation into defendant on behalf of the Prosecutor's Office. Olmo testified that as his investigation proceeded, he obtained defendant's sick leave and pay records from the NPD and St. Michael's. Olmo cross-referenced these records and discovered that starting on March 20, 2018, defendant worked a total of thirty-one days at St. Michael's despite being on sick leave from the NPD. Olmo calculated that defendant had earned

$11,217.04 in sick pay for those days. He also learned that defendant had bought a new truck costing approximately $60,000 in the summer of 2018.

## C.
### (Defendant's Trial Testimony)

Defendant testified that he was not informed about the NPD's sick leave and outside employment policies during roll calls while he was a patrol officer from 1993 to 1996. He did not recall ever signing anything to the effect that he had received a physical copy of either.

Defendant claimed that after he became a detective, he was not privy to any announcements about, or training on, policies that occurred during roll calls because he was not required to attend them. He said he "didn't have a clear understanding" of the outside employment policy when he began taking his administrative sick leave in 2018, and that he was never informed of what "circumstances" could lead to him being charged with a crime under that policy.

Defendant conceded that he was not exempt from the policy by virtue of being a detective and understood that all such policies were binding on him. He also did not contest that he worked at St. Michael's while on administrative sick leave from the NPD.

Defendant stated he had ordered an expensive vehicle in 2017, before he began taking sick leave, but that it was only delivered to him in 2018. However,

11

he admitted that a purchase order for the vehicle, which was entered into evidence was dated June 30, 2018.

According to defendant, when he was working in the Communications Division at the NPD, one of his duties was to gather and deliver boxes of audiotapes. He asserted the boxes he needed to lift weighed "forty-five, fifty, maybe up to like maybe seventy pounds," and that this worsened his back injury. Defendant testified his duty belt also weighed up to forty-five pounds, and that wearing it caused him serious pain. He said he "constantly had to stand up and move around" while working in Communications. Defendant did not testify about his duties when working at St. Michael's in 2018.

In his opening statement, defense counsel stated that defendant's job in Communications was "to sit in a room, look at a bank of screens that were bringing in camera feeds, [and] keep an eye on things." Counsel said that "if there was something amiss or something that had to be responded to, [defendant] would call in and . . . the people who are the guards there would check it out and do whatever needed to be done." Counsel commented that there was "no physical labor at all for [defendant] on that job."

12

## D.
### (This Indictment and Other Charges)

Defendant was charged in Indictment No. 19-06-1759, the indictment primarily at issue here, with theft by unlawful taking of payment for sick time from the NPD under N.J.S.A. 2C:20-3(a) (count one), and official misconduct under N.J.S.A. 2C:30-2(a) (count two). He was separately charged in Indictment No. 19-07-1907 with theft by unlawful taking of a vehicle from a car dealership under N.J.S.A. 2C:20-3(a), passing bad checks under N.J.S.A. 2C:21-5(b), and official misconduct, and in Indictment No. 22-01-99 with conspiracy to distribute a controlled dangerous substance ("CDS") under N.J.S.A. 2C:5-2 and 2C:35-5(a)(1), distribution of CDS under N.J.S.A. 2C:35-5(a)(1) and (b)(1), and official misconduct.[1]

As we will discuss in more detail in Part III(A) of this opinion, on August 24, 2020, a pretrial judge[2] granted private defense counsel's motion to be relieved and directed that defendant be represented by a public defender if he did not hire new private counsel within seven days. With a public defender as

---

[1]  The additional counts of official misconduct in these two indictments were based on those other charges, and not based on the sick pay policy violation at issue here.

[2]  A different judge ("the trial judge") eventually tried the case.

A-0117-23

his counsel, defendant was tried before a jury on the charges in Indictment No. 19-06-1759 over several days in March 2023.

E.
(Verdict and Sentencing)

After the proofs closed, the trial judge denied defendant's motion for acquittal. The jury found defendant guilty on both counts.

A few weeks after the trial, defendant pled guilty as to the other two indictments, passing bad checks, an amended charge of third-degree conspiracy to distribute CDS, and official misconduct related to the CDS charge. The State agreed to recommend an aggregate sentence on those other charges of five years imprisonment, to run concurrent with the sentence defendant received on the indictment that was tried.

In April 2023, the trial judge sentenced defendant on all three indictments to concurrent sentences of five years imprisonment on each of the five charges for which he was convicted. The remaining charges in Indictment Nos. 19-07-1907 and 22-01-99 were dismissed. Defendant also forfeited his public employment.

A-0117-23

F.
(Appeal)

This appeal followed. Defendant raises the following arguments in his

counseled briefs:

POINT I

A JUDGMENT OF ACQUITTAL SHOULD HAVE
BEEN GRANTED AS TO THE OFFICIAL
MISCONDUCT CHARGE BECAUSE
DEFENDANT'S VIOLATION OF INTERNAL
POLICE DEPARTMENT POLICIES WAS NOT "AN
UNAUTHORIZED EXERCISE OF HIS OFFICIAL
FUNCTIONS."

A. The Sick Time And Outside
Employment Policies Do Not Establish
Duties Imposed "By Law."

B. The Duty To Abide By The NPD's Sick
Time And Outside Employment Policies Is
Not "Clearly Inherent In the Nature" Of A
Police Officer's Public Position.

POINT II

DEFENDANT WAS ERRONEOUSLY DEPRIVED
OF HIS CONSTITUTIONAL RIGHT TO COUNSEL
OF CHOICE.

POINT III

DEFENDANT WAS DENIED THE RIGHT TO A
FAIR TRIAL AND DUE PROCESS OF LAW DUE TO
THE ERRONEOUS ADMISSION OF HEARSAY
EVIDENCE (Not Raised Below).

15

POINT IV

THE THEFT CONVICTION MUST BE REVERSED
BECAUSE THE COURT FAILED TO INSTRUCT
THE JURY ON THE CLAIM OF RIGHT DEFENSE,
FAILED TO TAILOR THE THEFT INSTRUCTION,
AND FAILED TO PROPERLY RESPOND TO A
JURY QUESTION ABOUT THE ABSENCE OF
EVIDENCE (Not Raised Below).

A. It Was Plain Error To Omit A Claim Of
Right Charge Where The Evidence
Established The Defense And The State
Improperly Suggested That Defendant's
Mental State Was Irrelevant To The Jury's
Determination Of Whether He Committed
Theft.

B. The Court's Failure To Tailor The Theft
Instruction And To Properly Respond To A
Jury Question About The Absence Of
Evidence Mandate Reversal.

POINT V

THE PROSECUTOR'S IMPROPER BURDEN
SHIFTING AND COMMENTS ON FACTS NOT IN
EVIDENCE REQUIRE REVERSAL (Not Raised
Below).

A. The Prosecutor Improperly Shifted The
Burden Of Proof To The Defense On The
Factual Question Of Whether Defendant
Violated The Sick Leave Policy By Faking
Being Sick.

B. The Prosecutor Relied On Facts Not In
Evidence When Attempting To Explain

16

Why Defendant Was Criminally Prosecuted For Violating Internal Police Department Policies And Offered His Personal Belief In Defendant's Guilt.

POINT VI

THE IMPROPER ADMISSION OF OTHER-BAD ACTS EVIDENCE REQUIRES REVERSAL (Not Raised Below).

POINT VII

THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL SUCH THAT HIS TRIAL CONVICTIONS SHOULD BE REVERSED AND HE SHOULD BE GIVEN THE OPPORTUNITY TO WITHDRAW FROM HIS SUBSEQUENT GUILTY PLEA (Not Raised Below).

POINT VIII

THE OFFICIAL MISCONDUCT CONVICTIONS SHOULD MERGE, RESPECTIVELY, WITH THE THEFT AND CONSPIRACY CONVICTIONS (Not Raised Below).

POINT IX

RESENTENCING IS REQUIRED BECAUSE THE SENTENCING PROCEEDING WAS REPLETE WITH ERRORS.

A. The Sentencing Court Failed To Explain Why It Did Not Find Applicable Mitigating Factors 8 And 9.

A-0117-23

B.  The Sentencing Court Did Not Provide A Factual Basis For Its Application Of Aggravating Factor 9.

C.  The Sentencing Court Did Not Assign Weight To Any Of The Factors It Found.

D.   The Sentencing Court Failed To Consider The Application Of The Aggravating Factors To Each Individual Offense.

Additionally, defendant presented this supplemental argument in his uncounseled self-represented brief:

SUPPLEMENTAL POINT I

THE TRIAL COURT SHOULD HAVE GRANTED A JUDGMENT OF ACQUITTAL AS FOR THE CONVICTIONS FOR OFFICIAL MISCONDUCT AND/OR THEFT BECAUSE THE STATE FAILED TO PRODUCE SUFFICIENT EVIDENCE AND MEET ITS BURDEN IN PROVING ALL ELEMENTS OF THE OFFENSE AS REQUIRED BY LAW.

After hearing the initial oral argument on appeal, we invited the Attorney General and the Association of Criminal Defense Lawyers of New Jersey to participate as amici curiae, limited to the issues relating to the official misconduct conviction.  They accepted our invitation and took part in additional helpful briefing and re-argument.

18

## II.

We primarily focus in this opinion on the legal viability of defendant's conviction of official misconduct under N.J.S.A. 2C:30-2(a).

N.J.S.A. 2C:30-2 provides:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
>
> a.  He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner; or
>
> b.  He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.
>
> [(Emphasis added).]

Here, defendant was charged in count two under N.J.S.A. 2C:30-2(a), which concerns the commission of a qualifying unauthorized act. He was not charged under subsection (b) of the statute, which concerns inaction, i.e., knowingly refraining from performing a duty.[3]

---

[3]  Because subsection (b) was not charged, we need not ponder whether defendant had a duty to advise the NPD to not send him (or to stop sending him) sick pay benefits while he was working at the hospital, or a duty to not deposit those sums, or a duty to refund the money, or a duty to advise the NPD that he was healthy enough to work at the hospital, or failed to perform some other conceivable and unperformed duty.

A-0117-23

Violation of the statute exposes a defendant to a stiff criminal penalty. Official misconduct is graded as a second-degree offense, although if the benefit involved is pecuniary and valued at $200 or less (not applicable here), the offense is a third-degree offense. See N.J.S.A. 2C:30-2 (unnumbered final paragraph); see also State v. Phelps, 187 N.J. Super. 364, 374-76 (App. Div. 1983), aff'd, 96 N.J. 500 (1984).

Pursuant to N.J.S.A. 2C:43-6.5, a defendant convicted of second-degree official misconduct must be sentenced to a mandatory minimum term of at least five years' imprisonment without eligibility for parole. In addition, under the general terms of N.J.S.A. 2C:43-6(a)(2), a sentence for a second-degree crime must be between five and ten years.

### A.
### (New Jersey Statutory and Legislative History)

The origins of New Jersey's official misconduct statute extend back as far as 1898, when the Legislature established "neglect of duty" as a misdemeanor. That 1898 statute provided that "[a]ny magistrate or other public officer who shall willfully refuse or neglect to perform . . . any duty imposed upon him by law" committed the offense. L. 1898, c. 235, § 23. Official misconduct was also considered a common law offense in New Jersey. See State v. Lombardo, 18 N.J. Super. 511, 522 (Law Div. 1952) (observing that "[m]alfeasance in

20

office, generally termed official misconduct, is a common law offense").  Later revisions of the state criminal code retained the same essential text from the 1898 statute until the adoption of the modern New Jersey Criminal Code in 1978. See, e.g., N.J. Rev. Stat. § 2:160-1 (1937).

The concept of official misconduct was redefined in the 1978 Criminal Code.  An associated Senate Judiciary Committee statement declared that Chapter 30 of the revised code codified those official misconduct offenses "which, while not found in current New Jersey statutes, were indictable at common law."  Senate Judiciary Statement to S. 738, at 7 (May 15, 1978).  An amendment in 1979 deleted a reference to "corrupt" intent, which had been an undefined term.  Senate Judiciary Statement to S. 3203, at 7 (June 18, 1979). The text of our statute in Title 2C has remained unchanged since it became effective in 1979.

B.
(Parallels with New York Law)

When the 1978 Criminal Code was enacted, the drafters looked substantially to the official misconduct laws of the State of New York.  See State v. Hinds, 143 N.J. 540, 548 (1996) ("[O]ur [official misconduct] law is based

on New York law").[4]  The history of New York's official misconduct statute is therefore comparatively instructive.

New York Penal Law of 1881 had provided that a public officer "upon whom any duty is enjoined by law, who willfully neglects to perform the duty, is guilty of a misdemeanor."  N.Y. Penal Law former § 117 (1881); see also id. § 154 (criminalizing the omission of official duties).

In 1965, New York undertook a large-scale revision and modernization of its Penal Law.  As part of that process, the New York State Commission on Revision of the Penal Law and Criminal Code, known as the "Bartlett Commission," was convened to study and simplify the New York laws.  The Bartlett Commission recommended that New York replace "some thirty existing Penal Law provisions . . . involving violations of specific duties by specified public officers."  Proposed New York Penal Law § 200.00 [now § 195.00] at 370 (1964) ("Bartlett Committee Notes"); see also William C. Donnino, Prac. Comments., McKinney's Cons. L. of N.Y., Penal Law § 195.00 (2025).

---

[4]  Although many other portions of the new Code were derived from the Model Penal Code or our state's previous criminal laws, the new section for the official misconduct statute—N.J.S.A. 2C:30-2—simply cited its source as "New." Official Copy Reprint of S. 738 117 (Aug. 10, 1978).  It did not mention New York law.

New York in 1965 adopted a revised official misconduct statute whose elements are substantially the same as the later New Jersey counterpart in N.J.S.A. 2C:30-2. One noteworthy difference is that our own statute additionally prohibits officials in subsection (a) from committing acts relating to their office "in an unauthorized manner." Compare N.Y. Penal Law § 195.00(a) with N.J.S.A. 2C:30-2(a).

Specifically, N.Y. Penal Law § 195.00(a), the analog to N.J.S.A. 2C:30-2(a), provides in pertinent part:

> A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit: [] He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized[.]
>
> [(Emphasis added).]

As counsel noted, the 1965 revision to the New York Penal Law is the first appearance of the phrase "unauthorized exercise of his official functions" in the statutory history of the official misconduct offense in either state's law. N.Y. Penal Law § 195.00(a) (2025). As we will see, infra, that concept, replicated in N.J.S.A. 2C:30-2(a), becomes a critical aspect of our analysis in this case.

## C.
### (Elements of Subsection (a))

23

With this background in mind, we turn to the elements of the statute and, in particular, subsection (a).

To begin with, the prefatory text of N.J.S.A. 2C:30-2, which covers both subsections (a) and (b), requires that the defendant be "a public servant." That requirement is readily satisfied here because defendant was a municipal police officer.

The prefatory text further requires the public servant to act "with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit." N.J.S.A. 2C:30-2. That requirement was also proven here, as the State showed that defendant purposely obtained a "benefit for himself" through his receipt of sick pay from the NPD while simultaneously working as a private security guard. See State v. Cetnar, 341 N.J. Super. 257, 264 (App. Div. 2001), certif. denied,170 N.J. 89 (2001) (treating a county prosecutor's office detective who improperly used departmental funds disbursed for an undercover narcotics investigation to pay his personal expenses as the purposeful recipient of a "benefit" under the statute).

Following the statutory preface, subsection (a) then delineates several elements of official misconduct involving active conduct rather than failure to

24

perform a duty. For ease of reference, the elements can be displayed with bullet points as follows:

- "[Defendant] commits an act relating to his office but constituting an unauthorized exercise of his official functions;"

- "[K]nowing that such act is unauthorized or he is committing such act in an unauthorized manner."

Much of the briefing before us addresses the second bullet point, concerning whether the State sufficiently proved that defendant's conduct was "unauthorized," and that he "knowingly" engaged in that unauthorized conduct. The State contends defendant's receipt of sick pay from the NPD while he was working as a private security guard was "unauthorized" because, as the documentary exhibits and testimony from its witnesses showed, the policy of the NPD disallowed officers from obtaining sick pay while employed in another job. The State further asserts, as the jury evidently found despite defendant's denials, that he knew his employer's policy prohibited such "double dipping."

Defendant counters that the State's evidence failed to prove such an "unauthorized" act, arguing that the statute should not be construed to criminalize conduct that merely violates workplace administrative policies. Defendant further contends that the State did not prove beyond a reasonable

doubt that he "knowingly" violated the policy, as it did not present any signed acknowledgment form or other documentary evidence that he was properly informed of the policy.

We need not resolve here those issues of what is "unauthorized" conduct[5] or concerning the extent of defendant's knowledge because the analysis instead can turn on another critical element of subsection (a):  specifically, whether the defendant committed "an act relating to his office but constituting an unauthorized exercise of his official functions."  (Emphasis added).

When considering this element, our courts "look to the scope of the defendant's apparent authority" to determine whether the alleged misconduct "sufficiently relates to the defendant's office."  State v. Thompson, 402 N.J. Super. 177, 192 (App. Div. 2001).  "[N]ot every offense committed by a public official involves official misconduct."  Hinds, 143 N.J. at 549.  It is insufficient to show that an act of misconduct was "committed by a person who happens to

---

[5]  We therefore do not need to resolve the conceptual question of whether the term "unauthorized," which is not defined in the statute, encompasses only conduct that is explicitly prohibited, or whether it also extends to conduct that is not explicitly permitted by the public employer's policies.  We also need not resolve whether subsection (a) criminalizes allegedly minor or de minimis violations of workplace policies, such as a one-time unauthorized use of a squad car during lunch hour to pick up an officer's dry cleaning, or (as hypothesized by the public defender), the unauthorized removal of pads and pens for personal use.

be a public officer." State v. Schenkolewski, 301 N.J. Super. 115, 144 (App. Div. 1997). Instead, the State must show that the misconduct is connected to the defendant's "official duties." Ibid. There must be "a relationship" between the conduct and the defendant's office, and the defendant "must rely upon his or her status as a public official to gain a benefit or deprive another." State v. Kueny, 411 N.J. Super. 392, 405 (App. Div. 2010).

The case law in our state involving law enforcement officers or employees convicted of official misconduct under subsection (a) typically has involved situations in which the "unauthorized exercise of official functions" entails a misuse of the defendant's authority as a law enforcement official. The misuse may involve either off-duty or on-duty conduct, and it can be committed while the officer is on leave or suspended. State v. Bullock, 136 N.J. 149, 157 (1994).

For instance, our courts have upheld convictions of law enforcement officers under N.J.S.A. 2C:30-2 in the following scenarios: (1) an off-duty detective's use of his office to avoid suspicion from store management while working with a shop's security manager to shoplift, Hinds, 143 N.J. at 540; (2) a suspended police officer displaying his identification card to fraudulently "arrest" two individuals, Bullock, 136 N.J. at 151; (3) an off-duty police officer donning his uniform to fake a drug arrest, State v. Johnson, 127 N.J. 458, 462-

63 (1992); (4) a police officer's "use of public resources during business hours" to make phone calls and send e-mails to an undercover detective posing as a fourteen-year-old-girl, State v. Davis, 390 N.J. Super. 573, 589 (App. Div. 2007); (5) a police officer using a police car and public telephone for personal business, State v. Gleitsmann, 62 N.J. Super. 15, 19-20 (App. Div. 1960); and (6) a police officer who unconstitutionally strip searched a person, State v. Stevens, 203 N.J. Super. 59, 67-68 (Law Div. 1984). See also Cetnar, 341 N.J. Super. at 259-60 (involving a detective's official functions in improperly securing funds for a supposed undercover narcotics investigation).

By contrast, in State v. Kueny, 411 N.J. Super. at 408, we found that the defendant police officer "did not use his status as a police officer" when accidentally withdrawing and then improperly keeping money from someone else's bank account at an ATM. See also State v. DeCree, 343 N.J. Super. 410, 418 (App. Div. 2001) (holding that a defendant's actions in joining a scheme to defraud the State Health Benefits Program "had nothing to do with her status as a security guard").

New York case law has adopted similar approaches to the "official functions" requirement. For example, in People v. Arcila, 59 N.Y.S. 3d 141, 142-43 (App. Div. 2017), the court held that the New York official misconduct

statute applied to a police officer who sexually assaulted a woman and stated that he could give her a ticket. Similarly, in People v. Watson, 821 N.Y.S. 2d 328, 331 (App. Div. 2006), the New York statute covered a police officer who targeted and sexually harassed a fellow officer during a traffic stop. By contrast, in People v. Rossi, 415 N.Y.S. 2d 21, 22 (App. Div. 1979), aff'd, 407 N.E. 2d 1345 (N.Y. 1980), the appellate court held the statute did not apply where the defendant took money to assist with traffic tickets, which had no relation to his functions as a corrections officer. Likewise, in People v. Groskin, 505 N.Y.S. 2d 475, 476 (App. Div. 1986), the appellate court held that the New York statute did not extend to an employee of the Department of Corrections who postured as though he had discretion over conjugal visits in order to solicit sexual favors.

## D.
## (Application to This Case)

Applying these principles to the circumstances here, we conclude as a matter of law that defendant's conduct, although it was a crime of theft,[6] did not "constitute" the "unauthorized exercise of his _official functions_." (Emphasis added). His behavior in accepting the sick pay benefits did not entail any of the customary functions of a police officer or detective, such as responding to police

---

[6] See our discussion of the theft issues in Part III(B), infra.

dispatches, investigating possible criminal activity, tracking down and interviewing witnesses, arresting or interrogating suspects, seizing physical evidence, procuring search warrants, preparing and compiling police reports, and the like. He did not interact with the public acting, or pretending to act as, a law enforcement official. He was not functioning as a police officer. Nor was he portraying himself to others as acting in an official police capacity, as was the case in some of the cited opinions.

As we noted above, while working as a private security guard, defendant wore a uniform with a badge that clearly indicated he was an employee of St. Michael's hospital, not the NPD. In addition, his duties on the premises were limited and NPD officers would be summoned to the scene in various situations. In short, he was not engaged in what "constitutes" the "official" functions of a municipal police officer.

In construing the statute in this manner, we are guided in part by the rule of lenity, which generally requires that criminal statutes be strictly construed such that "words are given their ordinary meaning and that any reasonable doubt . . . is decided in favor of [the defendant]." State v. Olivero, 221 N.J. 632, 639 (2015) (alteration in original). The circumstances here do not clearly transgress subsection (a)'s requirement that the defendant engage in the "unauthorized

exercise of his official functions." By working as a private security guard while on sick leave status, defendant was not manifestly engaged in "official functions." There is no evidence he was holding himself out to people at the hospital as a city police officer.

Simply put, subsection (a)[7] does not encompass these particular facts. Based on these legal reasons, we are constrained to vacate defendant's conviction of official misconduct under count two of the indictment. In doing so, we should not be understood as condoning in any way defendant's dishonest behavior and his improper receipt of taxpayer-funded sick pay that he did not deserve. That wrongdoing was properly found by the jury to be the commission of theft, which we will discuss in more detail, infra. Nor do we rescind or foreclose the imposition of civil or administrative sanctions as disciplinary measures. The conviction of count two is accordingly vacated.

III.

**[At the discretion of the court pursuant to Rule 1:36-3, the published version of this opinion omits Part III, which addresses issues other than the official misconduct issue.]**

---

[7] Again, we offer no advisory opinion about the potential applicability of the failure-to-act elements of subsection (b).

A-0117-23

Affirmed in part, reversed in part, and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0117-23